# IN THE SUPREME COURT OF IOWA

No. 09–0141

Filed March 9, 2012

**STATE OF IOWA,**

Appellee,

vs.

**WILLIAM ARTHUR DEWITT,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.

Appellant seeks further review of court of appeals decision affirming his drug convictions by challenging the sufficiency of evidence and the force used to stop him for questioning. **DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT AND SENTENCE OF DISTRICT COURT AFFIRMED.**

Kent A. Simmons, Davenport, for appellant.

Thomas J. Miller, Attorney General, Bruce L. Kempkes, Assistant Attorney General, Michael J. Walton, County Attorney, and Kelly G. Cunningham, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal, we must primarily decide if the physical force used by police to conduct a *Terry* stop was unreasonable and violative of the search-and-seizure provisions of our State and Federal Constitutions. The district court found the force used was not unreasonable, and the defendant was subsequently convicted of the crimes of possession with intent to deliver, violation of the drug tax stamp act, and interference with official acts. We transferred to the court of appeals, and it affirmed the convictions. On our review, we affirm the decision of the court of appeals and the judgment and sentence of the district court.

### I. Background Facts and Proceedings.[1]

On June 5, 2008, officers from the Davenport Police Department initiated an investigatory encounter with William Arthur DeWitt, initially based on information provided to them by a confidential informant who had worked with Davenport police in the past. The source provided a description of DeWitt and indicated DeWitt planned to sell marijuana at the Davenport Walmart at approximately 8:30 p.m. on June 5, 2008. The informant further told police that DeWitt would be driving a gray Lincoln Town Car with Illinois license plate number A244897. A police surveillance team was positioned in the Walmart parking lot to await DeWitt's arrival. Shortly after 9 p.m., DeWitt drove into the parking lot of the store in a gray Lincoln Town Car. He parked the car and entered the store.

Detectives Brian Morel and Daniel Westbay from the police narcotics division followed DeWitt into the store while the other officers

---

[1]The background facts are drawn from testimony presented at trial and at a hearing on the pretrial motions filed in the case.

secured DeWitt's car in the parking lot. Both detectives were dressed in plain clothes but had identifying badges hanging around their necks. The detectives observed DeWitt walking towards the south side of the store then back to the north entrance where he had initially entered. Ultimately, DeWitt walked to the hygiene section of the store where the detectives observed that he "appeared to be looking . . . for somebody."

The detectives decided to confront DeWitt and take him outside to his car to talk to him about their suspicion that he was selling drugs. They approached DeWitt in an aisle, and one or both of the officers took DeWitt by the arm.[2] Detective Morel pulled out his badge and advised DeWitt he was a detective and wanted to talk to him outside the store about a drug investigation. DeWitt claimed neither officer presented an identification badge. DeWitt immediately resisted the confrontation by breaking free from their grasp as if he intended to run. The detectives promptly responded by taking him to the ground and handcuffing him. DeWitt's head was injured when it hit the floor during the arrest.

The K–9 unit arrived at the Walmart parking lot to perform a free air sniff of the Lincoln. The dog signaled that there were drugs in the vehicle, and a search warrant was subsequently obtained for the vehicle. Officers discovered a pound of marijuana in the trunk of the car. The

---

[2]At trial, Detective Morel testified that Detective Westbay first took hold of DeWitt's elbow. He further testified DeWitt attempted to break free from his own grasp and run past Detective Westbay. At the suppression hearing prior to trial, Detective Morel testified only to his own action in taking hold of DeWitt's right arm. Cross-examination did not explore the discrepancy, and no other part of the record clarifies the facts. Additionally, the district court did not make a factual finding. Because we give deference to the district court's credibility determinations, we find Detective Morel's modified statement at the trial indicates the level of force used was generally the grabbing of DeWitt's right arm to secure his presence with the officers.

State charged DeWitt with possession with intent to deliver, violation of the drug tax stamp act, and interference with official acts.

DeWitt filed a motion to quash the arrest and a motion to suppress evidence obtained during the search of his vehicle. DeWitt also filed a motion to compel disclosure of the identity of the confidential informant. After an evidentiary hearing, the district court denied the motions. The court found the detectives had reasonable suspicion DeWitt was involved in a drug crime at the time of the encounter based on evidence that had been corroborated independently of the confidential informant's report as well as DeWitt's conduct in the store, including his resistance to the encounter. The court further determined the facts did not necessitate the disclosure of the confidential informant's identity because the informant was not a participant in or witness to the alleged crimes, and DeWitt did not otherwise make a sufficient showing that the informant's identity would be helpful to his defense to any issue or claim. The case proceeded to a bench trial, and the district court found DeWitt guilty of all three counts.

DeWitt appealed and raised four issues. First, he asserted the officers' conduct in physically restraining him without particularized reasonable suspicion that he posed a safety threat was a violation of his right to be protected from unreasonable seizures under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Second, he argued the district court erred in finding sufficient evidence supporting the charge for possession of drugs with intent to deliver because the court wrongly inferred that he had knowledge of the drugs in the car he was driving. Third, he asserted there was insufficient evidence to support the charge of interference with official acts because neither Detective Morel nor Detective Westbay

engaged in an "act which is within the scope of the lawful duty or authority of that officer." *See* Iowa Code § 719.1 (2007). Finally, he claimed ineffective assistance of trial counsel.

We transferred the case to the court of appeals. The court of appeals affirmed the district court, specifically finding no constitutional violation because "the officers took reasonable precautionary actions for their own protection as well as for the protection of the public." The court of appeals also determined the State had presented substantial evidence to prove DeWitt's constructive possession of the drugs independent of the confidential informant's tip that the drugs were in the car DeWitt drove to the store. It declined to address the ineffective-assistance-of-counsel claim. We granted DeWitt's application for further review.

## II. Standard of Review.

DeWitt requests we review both his constitutional claim that he was subject to an unreasonable seizure and his claim there was insufficient evidence in the record to convict him. We review claims the district court failed to suppress evidence obtained in violation of the federal and state constitutions de novo. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). Claims of insufficient evidence to support a conviction are reviewed for errors at law. *State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008). The court's findings of guilt are binding if we find they were supported by substantial evidence. *Id.* "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.*

## III. Preservation of Error.

At the outset, the State asserts the issue of reasonable force permitted under article I, section 8 of our state constitution is not

preserved for our review. Although DeWitt raised both the State and Federal Constitutions in his motions before the district court, the court did not include separate findings under article I, section 8 from its findings under the Fourth Amendment. The State argues DeWitt's failure to file a motion for enlargement of findings is fatal to his claim under the Iowa Constitution.

We do not review issues that have not been raised or decided by the district court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). However, when both constitutional provisions are raised by a party, we may review arguments raised under both constitutions. *Compare King v. State*, 797 N.W.2d 565, 571 (Iowa 2011) (noting "[w]hen there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims preserved"). Even though defendant is seeking reversal of the district court, we may affirm the district court upon any ground that would properly support the ruling, as long as it was one raised by the defendant, even if it is not a ground on which the court based its holding. *State v. Maxwell*, 743 N.W.2d 185, 192 (Iowa 2008). Thus, in this case, we may review the claim of unreasonable force under both the State and Federal Constitutions.

Nevertheless, both parties make arguments using only the federal constitutional standard for unreasonable seizures. Although we have discretion to consider a different standard under our state constitution, neither the State nor DeWitt suggest a different state analysis or offer any reasons for a separate analysis. *See Pals*, 805 N.W.2d at 771–72 (holding, even when a party has not proposed a different standard for interpreting a state constitutional provision, we may apply the standard

more stringently than the federal caselaw). We decline to consider a different state standard under the circumstances and resolve DeWitt's state and federal unreasonable seizure claims under the existing federal standards. *State v. Dudley,* 766 N.W.2d 606, 624 (Iowa 2009); *see also State v. Effler,* 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., specially concurring) ("In raising a constitutional claim under the state constitution, counsel should do more than simply cite the correct provision of the Iowa Constitution. . . . [T]he adjudicative process is best advanced on reasoned argument which has been vetted though the adversarial process.").

**IV. Analysis.**

**A. Suppression of Evidence.** DeWitt first argues the court of appeals erred in finding the police conduct inside the store was reasonable. He asserts his Fourth Amendment guarantee to be free from unreasonable seizures was violated because the officers were not authorized to use physical force to stop him for questioning. DeWitt does not argue the police had no constitutional basis to stop him. Instead, DeWitt primarily argues the officers used an unconstitutional method of carrying out the seizure by immediately grabbing his arm and attempting to physically remove him from the store for questioning. To resolve this issue, we must consider the degree of physical force law enforcement may use in perfecting a stop based on reasonable suspicion.

1. *General parameters of Fourth Amendment protection from unreasonably forceful seizures.* The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S. Ct. 2476, 2481, 53 L. Ed. 2d 538, 546 (1977), *abrogated on other grounds by California v. Acevedo,* 500 U.S. 565, 579, 111 S. Ct. 1982,

1991, 114 L. Ed. 2d 619, 633–34 (1991). Yet, this protection does not prohibit police from temporarily detaining an individual when they have reasonable grounds to believe criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889, 911 (1968); *see also* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.2, at 283 (4th ed. 2004) [hereinafter LaFave]. The rationale for allowing such a stop on less than probable cause is to allow police to "confirm or dispel suspicions of criminal activity through reasonable questioning." *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). Thus, when police temporarily detain an individual pursuant to a reasonable suspicion of a crime, a "seizure" for purposes of the Fourth Amendment has occurred, and the seizure must be tested under the Fourth Amendment for reasonableness. *Id.* This seizure is commonly known as a *Terry* stop.

The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443, 455 (1989). Any use of physical force, however, is subject to the standard of reasonableness under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1, 7–8 (1985) (stating a seizure must be reasonable in "how it is carried out"). Thus, law enforcement is not prohibited from using physical force in effecting an investigatory stop, but each seizure must be scrutinized for reasonableness under the particular circumstances at the time of the stop. *Id.* at 8–9, 105 S. Ct. at 1700, 85 L. Ed. 2d at 8.

Several guiding principles for reasonableness of force have been established over time. First, the test for reasonableness of police conduct "requires a careful balancing of ' "the nature and quality of the intrusion

on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871, 104 L. Ed. 2d at 455 (quoting *Garner*, 471 U.S. at 8, 105 S. Ct. at 1699, 85 L. Ed. 2d at 7). This balancing of interests is consistent with search-and-seizure analysis in other contexts as the crucial tenet under the Fourth Amendment. *See Michigan v. Summers*, 452 U.S. 692, 701 n.12, 101 S. Ct. 2587, 2593 n.12, 69 L. Ed. 2d 340, 348 n.12 (1981). The balance recognizes the importance of both individual liberty and law enforcement's duty to preserve their and the public's safety.

Second, the Fourth Amendment does not require officers to risk their lives when encountering a suspect they reasonably believe is armed and dangerous. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). Nor does it "require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612, 616 (1972). Thus, the inherent danger surrounding an investigatory stop may justify more intrusive methods of detaining an individual. *See Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996).

Third, the force used to detain a suspect during an investigatory stop must be limited to what is necessary to accomplish the goals of the detention. Thus, the amount of force necessary to investigate the crime that justified the stop, maintain the status quo, and ensure the officers' and others' safety will vary depending on the facts and circumstances of each case. *See United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *United States v. Hensley*, 469 U.S. 221, 235–36, 105 S. Ct. 675, 683–84, 83 L. Ed. 2d 604, 616 (1985)). Although not all

seizures require probable cause to be reasonable, reasonable suspicion of criminal activity generally justifies only a narrow deviation from the Fourth Amendment's requirement for a warrant. *See Florida v. Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 1324, 75 L. Ed. 2d 229, 237 (1983). Thus, a seizure justified by reasonable suspicion must be minimally intrusive, *United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 2645, 77 L. Ed. 2d 110, 122 (1983), and "[t]he scope of the detention must be carefully tailored to its underlying justification," *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325, 75 L. Ed. 2d at 238. If an investigative stop is too long in duration or more invasive than necessary to accomplish the goals of the investigation, the stop will become a de facto arrest. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605, 615 (1985). Of course, an arrest without probable cause is illegal, and identifying the fine contours between an arrest and an investigatory detention creates "difficult line-drawing problems." *Id.* Despite such limitations, however, the general trend in federal courts "has led to the permitting of . . . measures of force more traditionally associated with an arrest than with investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224–25 (7th Cir. 1994). As a result, identical police conduct can be an arrest under some circumstances and a mere stop in others. Such difficulty with the doctrinal flexibility of the reasonableness standard underscores the importance of analyzing the totality of the circumstances in each case. *Garner*, 471 U.S. at 8–9, 105 S. Ct. at 1700, 85 L. Ed. 2d at 8.

Finally, the Supreme Court has established one bright-line rule: the use of deadly force to stop an unarmed, nondangerous suspect is never constitutionally reasonable. *Id.* at 11, 105 S. Ct. at 1701, 85 L. Ed. 2d at 9–10. In general, to be reasonable, the force applied must be

proportionate to the need for the force raised by the circumstances. *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

Therefore, a stop supported by reasonable suspicion of criminal activity must be minimally intrusive, but physical force used to detain a suspect believed to be a threat to safety is reasonable if the force used is proportional to the threat presented. A suspect does not have the freedom to walk away from a proper investigatory detention.

2. *Application of constitutional standard to facts.* DeWitt argues two violations of his Fourth Amendment rights occurred during the stop. First, he argues the officers did not have the authority under *Terry* to grab his arm with only reasonable suspicion that he was involved in a drug delivery. He asserts the officers did not have a reasonable belief he was carrying a weapon and could only assert their authority over him under the Fourth Amendment by patting him down with a particularized belief he was carrying a weapon. Second, he argues the officers used unreasonable force to continue the detention when they tackled him to the floor.

In determining whether a particular seizure is reasonable, we apply an objective standard to the facts available to the officer at the time of the encounter to decide whether the officer was justified in believing a particular amount of force was necessary to carry out the seizure. *Terry*, 392 U.S. at 21–22, 88 S. Ct. 1880, 20 L. Ed. 2d at 906. We view the facts from the perspective of a reasonable officer on the scene, not one with the illumination of hindsight. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455–56. Additionally,

> [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455–56. The extent of the intrusion is considered first. *See Garner*, 471 U.S. at 8–9, 105 S. Ct. at 1700, 85 L. Ed. 2d at 8. We examine the police method and the extent the person's liberty was restricted by that method in light of the specific circumstances justifying the use of such force. *Lambert*, 98 F.3d at 1185. Some factors that are relevant to proportionality of the force used include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455.[3] More serious offenses may justify a greater imposition of force. *See Lee*, 284 F.3d at 1198. Additionally, an uncooperative suspect who is attempting to flee justifies the imposition of more force. *See Lambert*, 98 F.3d at 1189.

The district court found the officers had reasonable grounds to believe DeWitt was involved in the delivery of illegal drugs. It relied upon the officers' experience as narcotics investigators to conclude the officers had a reasonable belief that DeWitt, as a suspected dealer, posed a risk of flight and harm to other customers as long as he was in the store. Although the officers did not initiate a pat down of DeWitt to search for

---

[3]Although typically the Fourth Amendment is substantively associated with the protected interest in privacy from government intrusion, it is also recognized procedurally as one of two primary sources of a private cause of action for abusive government conduct. *Graham*, 490 U.S. at 394, 109 S. Ct. at 1871, 104 L. Ed. 2d at 454; 4 LaFave § 9.2 n.118, at 314. Although excessive force claims are often brought as civil rights claims under 42 U.S.C. § 1983, the cases are analyzed for a violation of the claimant's constitutional rights by balancing the governmental interest against the individual's right to be free from invasion. Because the reasonableness-of-force analysis is most often employed in § 1983 cases alleging an unreasonable seizure under the Fourth Amendment, we will apply the facts of this case to the standard using these cases as persuasive authority.

weapons, the court found credible the officers' testimony that they believed he might run from them and that their subsequent pursuit could risk harm to other customers in the store. The court, therefore, found the physical force used to restrain DeWitt, both before and after he resisted the officers' detention, was reasonable.

DeWitt asks that we craft a clear rule that officers cannot stop a person for the purpose of asking questions of the person to determine if criminal activity is afoot by physically grabbing the person. DeWitt argues grabbing an individual for whom the police have reasonable grounds to conduct an investigation is per se unreasonable, especially when the officers do not have any individualized suspicion that the individual has a weapon.

At the outset, we reject the adoption of a per se rule prohibiting police from grabbing the arm of a suspect to stop and briefly detain the person to obtain an explanation for suspicious circumstances surrounding the stop. The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455. Thus, it is necessary to assess every fact and circumstance of the situation in applying the constitutional standard of reasonableness. *See Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1777–78, 167 L. Ed. 2d 686, 696 (2007) (indicating no easy-to-apply legal test exists to determine reasonableness of force under the Fourth Amendment).

DeWitt's position that the force used in this case was unreasonable focuses almost exclusively on his right to personal liberty " 'free from arbitrary interference by law officers.' " *Maryland v. Wilson*, 519 U.S. 408, 411, 117 S. Ct. 882, 885, 137 L. Ed. 2d 41, 46 (1997) (quoting

*Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 332, 54 L. Ed. 2d 331, 336 (1977)). Certainly, a person shopping in a store has a strong interest in freedom from being approached and grabbed by the arm by plainclothes police officers prior to the time the police officers make any inquiry of the person to confirm or deny their reasonable suspicion of criminal activity. Yet, reasonableness of such an encounter depends on the balance of the individual right at stake against the public interest at stake, not just the existence of the individual right. Additionally, the balance here requires the nature of the competing interests on each side of the scale to be evaluated.

With respect to the individual right to personal liberty at stake, we recognize the officers were permitted to stop and detain DeWitt based on their reasonable suspicion of criminal activity. Thus, a person's freedom of movement can be properly curtailed once police have reasonable suspicion, and in this case, we must consider the degree to which the initial grab may have further intruded on the right at stake in the balancing process.

In the context of an automobile stop, the United States Supreme Court has held that, when police validly stop a vehicle for a traffic violation, the additional intrusion imposed on the driver when ordered to step outside the vehicle is only *de minimis* and the additional intrusion ordering passengers out of the vehicle is minimal. *Wilson*, 519 U.S. at 412, 414–15, 117 S. Ct. at 885–86, 137 L. Ed. 2d at 46, 48. Thus, minimal intrusions that accompany a stop do not necessarily add much weight to the personal liberty side of the scale. Additionally, while a person's arm can be grabbed in a violent and intrusive manner, it can also be grabbed as a nonthreatening gesture or benign means of ushering the person to a specific location. A violent grab would

constitute a greater intrusion than a grab that serves to usher or direct a person to a different location. In this case, there was no evidence the police officers violently grabbed DeWitt's arm. Thus, in balancing the personal liberty, the additional intrusion occasioned when police grab the arm of a person stopped for reasonable suspicion of criminal activity in a nonviolent manner is minimal.

Furthermore, the additional intrusion that would result from moving a *Terry* stop from inside a store into the parking lot of the store would be minimal, much like the *de minimis* intrusion of asking a motorist to step outside his or her vehicle during a traffic stop. *Mimms*, 434 U.S. at 111, 98 S. Ct. at 333, 54 L. Ed. 2d at 337. In this case, DeWitt had just parked his vehicle in the parking lot of the store, and the police were only requesting that he return to that location for questioning. In *Terry*, the police officer who made the stop not only grabbed the defendant at the point of the stop on a sidewalk, but he also then ordered him and his two accomplices from the sidewalk into an adjacent store. 392 U.S. at 7, 88 S. Ct. at 1872, 20 L. Ed. 2d at 897. We conclude the intrusion imposed on DeWitt up to the point in time when the officers grabbed his arm to usher him outside the store was minimal.

On the other side of the balance, the State asserts two primary public interests supported the police officers' actions in grabbing DeWitt's arm. In particular, officer safety was a weighty concern, as was the general safety of the other customers in the store. The suspected criminal activity involved drug dealing, which is a serious crime for which offenders often run from the police. Drug dealers are also generally known to carry weapons, which the police officers in this case indicated was a concern. *See Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909 (recognizing an officer "need not be absolutely certain

that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"); *see also Navarrete-Barron*, 192 F.3d at 791 (recognizing officers did not use unreasonable force when approaching stopped suspected drug dealer's vehicle with weapons drawn because drug trafficking "often is accompanied by dangerous weapons"); *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987) (holding police were justified in frisking narcotics suspect because weapons are "part and parcel for the drug trade"); *United States v. Post*, 607 F.2d 847, 851 (9th Cir. 1979) (holding it is not unreasonable to believe a narcotics dealer might be armed); *Carmouche v. State*, 10 S.W.3d 323, 330 (Tex. Crim. App. 2000) (concluding an officer's belief a suspect is armed and dangerous may be predicated on the nature of the suspected criminal activity). *But see Upshur v. United States*, 716 A.2d 981, 984 (D.C. 1998) ("Although we have recognized that 'drugs and weapons go together,' that connection standing alone is insufficient to warrant a police officer's reasonable belief that a suspect is armed and dangerous, and we have never so held." (quoting *Griffin v. United States*, 618 A.2d 114, 124 (D.C. 1992))).

We reject DeWitt's claim that police needed an individualized belief he was carrying a weapon rather than acting on general knowledge that most drug dealers carry weapons to make deliveries. Although the detectives did not know for sure whether DeWitt carried a weapon, their prior experience in narcotics investigations caused them to believe he could be a volatile suspect and the investigation would most safely be conducted outside the store. It is not our task to second-guess the detectives' assessment of DeWitt as dangerous or volatile based on the crime he was suspected of and his conduct leading up to the stop. *See*

*Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575, 84 L. Ed. 2d at 616 (noting courts should "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing").

On balance, the police conduct up to the point of stopping DeWitt and taking hold of his arm was reasonable. The interests of the State were superior to the liberty interests of DeWitt. Accordingly, we hold the police officers did not violate the search-and-seizure clause of our State and Federal Constitutions when they made a *Terry* stop for suspected drug dealing, in a store occupied by customers and employees, by grabbing DeWitt by the arm for the purpose of escorting him outside the store to obtain an explanation for the suspicious circumstances. We next turn to consider all the circumstances to determine if excessive force was used when police took DeWitt to the ground and placed handcuffs on him.

The interests of the State that justified the police action in grabbing DeWitt's arm for the purpose of escorting him to the parking lot continue to be relevant in determining if police were justified in tackling him and placing him in handcuffs. Of course, the intrusion of DeWitt's personal liberty was substantially impacted by the aggressive police actions. This intrusion added greater weight to the personal liberty side of the scale, and we must consider whether the additional circumstances added any weight to the public interest side of the scale.

Generally, physical force to detain a suspect is reasonable when the suspect refuses to stop when ordered to do so. *See United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (holding that tackling of suspect was not excessive when suspect took evasive action immediately upon encountering police, broke free and ran after officer grabbed his

jacket, and ignored officer's requests to stop); *Tom v. Voida*, 963 F.2d 952, 957–58 (7th Cir. 1992) (concluding forcible detention was reasonable because suspect's own evasive actions create the need for those steps). In this case, the fear the two officers had that justified grabbing DeWitt's arm—fear of flight when approached—quickly transformed into reality. Additionally, the officers feared he may be armed with a weapon and become a serious danger to others in the store. Consequently, the State's interests were quickly elevated, and these heightened interests justified a quick response by police. In the split second the officers were given to respond when DeWitt broke free from their grasp, they decided to further detain him by taking him to the ground rather than allowing him to run out of a crowded store and into the parking lot. *See Graham*, 490 U.S. at 397, 109 S. Ct. at 1872, 104 L. Ed. 2d at 456 (recognizing reasonableness must take into account that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving").

As a result, we find the officers' conduct in tackling DeWitt and placing him in handcuffs was objectively reasonable. The attempt to flee justified the additional force. We conclude the seizure was reasonable under the circumstances.

**B. Sufficiency of Evidence.**

1. *Possession with intent to deliver.* The district court convicted DeWitt of possessing marijuana with the intent to deliver it in violation of Iowa Code section 124.401. Under the statute, the State must prove the defendant "exercised dominion and control over the contraband, had knowledge of the contraband's presence, and had knowledge the material

was a narcotic."[4]  *Maxwell*, 743 N.W.2d at 193.  The location in which the substance is found guides our determination of possession.  In this case, marijuana was discovered in the vehicle DeWitt drove rather than on DeWitt's person.  As a result, the State had to prove DeWitt was in constructive, as opposed to actual, possession of the marijuana in the car.  *See id.*  Our standard for proof of constructive possession requires the State to show the defendant had knowledge of the controlled substance as well as the authority or right to control it.  *Id.*

In *State v. Reeves*, we said:

> If the premises on which such substances are found are in the exclusive possession of the accused, knowledge of their presence on such premises coupled with his ability to maintain control over such substances may be inferred. Although no further proof of knowledge by the State is required in cases of exclusive possession by the accused the inference of knowledge is rebuttable and not conclusive.  But where the accused has not been in exclusive possession of the premises but only in joint possession, knowledge of the presence of the substances on the premises and the ability

---

[4]In its brief, the State argues the definition provided in *Black's Law Dictionary* for "dominion" implies a defendant must have both title and possession in the contraband.  Viewing a "real proprietary interest . . . in contraband" as impossible, *Long v. United States*, 623 A.2d 1144, 1148 (D.C. Cir. 1993), the State invites this court to disavow the requirement of dominion and instead focus upon the issue of control.  In prior cases, we have indicated evidence resembling a proprietary interest may be necessary for a finding of constructive possession, although we emphasized that "an immediate right to control" distinguished cases when constructive possession should be found from cases when the defendant had a "raw physical ability to exercise control over the controlled substance."  *State v. Bash*, 670 N.W.2d 135, 138–39 (Iowa 2003); *accord State v. Atkinson*, 620 N.W.2d 1, 5 (Iowa 2000) ("While it seems anomalous to look at a defendant's 'right' to control illegal drugs in order to establish possession, that concept basically distinguishes a defendant's raw physical ability to exercise control over contraband simply because of the defendant's proximity to it and the type of rights that can be considered constructive possession.").  In both cases, the drugs at issue were located within the personal property of a person other than the defendant.  *See Bash*, 670 N.W.2d at 136–37 (marijuana located in defendant's husband's cardboard box); *see also Atkinson*, 620 N.W.2d at 2–3 (methamphetamine located in another person's fanny pack).  DeWitt does not argue he lacked title in the contraband.  Thus, we need not reach the issue of the exact meaning and significance of "dominion" in this appeal.

to maintain control over them by the accused will not be inferred but must be established by proof.

209 N.W.2d 18, 23 (Iowa 1973). Thus, possession may be inferred if the defendant is in exclusive possession of the premises in which the contraband was located. Vehicles, however, alter the exclusive possession rule because of its modern role as a shared accommodation. We will not recognize an inference creating a rebuttable presumption of possession involving vehicles when it has been established that multiple individuals had equal access to the vehicle. *State v. Kemp*, 688 N.W.2d 785, 788 (Iowa 2004). When there is joint control, we require additional evidence to connect the defendant to the controlled substance sufficient to support a conviction for possession. *Id.*

In this case, the uncontested evidence showed five other individuals besides DeWitt had access to the Lincoln Town Car in addition to a sixth key under the front license plate of the vehicle. Because DeWitt was not in exclusive control of the vehicle, sufficient evidence must exist that he had knowledge of the marijuana in the car and had the ability to maintain control over it. *Id.* at 789; *see also Maxwell*, 743 N.W.2d at 194 (finding insufficient evidence that defendant was in exclusive possession of car he was driving when defendant did not own it). Joint control cannot create a rebuttable presumption of possession as can facts showing exclusive control of the vehicle. However, a determination of constructive possession still requires we draw some inferences based on the facts of the case. *Maxwell*, 743 N.W.2d at 193. We have established several factors as guides in establishing proof of possession. These factors include:

> (1) incriminating statements made by the person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on

> the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance. Further, when the premises is a vehicle, the court may also consider these additional factors: (1) was the contraband in plain view; (2) was it with the person's personal effects; (3) was it found on the same side of the car or immediately next to the person; (4) was the person the owner of the vehicle; and (5) was there suspicious activity by the person.

*Id.* at 194 (citation omitted). The factors are not exclusive, and all facts and circumstances are considered to determine whether a reasonable inference is created that the defendant had knowledge and control over controlled substances. *Id.*

DeWitt correctly points out that none of the "specific factors" from *Maxwell* are expressly met. He made no incriminating statements. He was not present when the police discovered the marijuana, and he accordingly made no incriminating actions. DeWitt's fingerprints were not on the marijuana or its packaging. Additionally, the marijuana was located in the trunk of the car and not in plain view. The marijuana was not found with DeWitt's personal effects. Because the marijuana was found in the trunk of the car, it was not found on DeWitt's side of the car or immediately next to him. Finally, DeWitt does not own the vehicle; his father does.

DeWitt argues the court of appeals erred by applying a "catchall" factor to conclude the facts and circumstances of the case provided sufficient evidence of possession. He further argues that "factors that are dredged up under the catchalls should be connected to at least one of the specific factors [articulated in *Maxwell*]." As we have said before, the factors for determining constructive possession are not exclusive. *See id.* However, any relevant facts and circumstances that are considered in addition to the specific factors, whether it is circumstantial or direct evidence of the crime, must be sufficient to raise a fair inference of guilt.

*State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011). The evidence of guilt must generate more than suspicion, speculation, or conjecture. *Id.* Thus, we turn to consider the accompanying circumstances.

DeWitt was the most recent driver of the car. This circumstance is relevant to the constructive possession analysis, even if it does not amount to exclusive possession entitling the State to the inference discussed in *Reeves*. *See Maxwell*, 743 N.W.2d at 194. DeWitt was also a frequent driver of the car: he drove it six days a week for work and was evidently planning to drive it to a fishing expedition with a friend. While DeWitt and his father testified that persons other than DeWitt had access to the vehicle and may have occasionally operated it, DeWitt's frequent and recent use of the car remains pertinent, though not dispositive. *Cf. State v. Cashen*, 666 N.W.2d 566, 572 (Iowa 2003) ("[P]roximity to the drugs, though pertinent, is not enough to show control and dominion.").

The State also produced evidence that DeWitt exhibited "suspicious activity." DeWitt drove out of his way to come to the Iowa Walmart when he needed to be at work soon in Illinois. Although he claimed this was done as a favor to a friend, he could not remember the friend's name. The State also produced evidence that once he arrived, DeWitt paced the main aisle, "looking around as if he was attempting to meet somebody." Although DeWitt testified he went to Walmart to procure fishing equipment, he never approached the fishing aisle. *See United States v. Richardson*, 848 F.2d 509, 513 (5th Cir. 1988) (noting a defendant's explanation for conduct that is "so inherently implausible as to justify the inference that it was largely fabricated . . . is 'part of the overall circumstantial evidence from which possession and knowledge may be inferred' " (quoting *United States v. Phillips*, 496 F.2d 1395, 1398

n.6 (5th Cir. 1974))). Indeed, credibility determinations are an essential function of the fact finder. In this case, the district court found DeWitt's reasons for being inside the Walmart not credible.

Moreover, DeWitt's resistance of Detectives Morel and Westbay provides important evidence of conduct consistent with guilt. *See Maxwell*, 743 N.W.2d at 194 (holding that the fact that defendant "continued [to drive] for approximately one-hundred feet until pulling into the driveway of his residence" supported a finding of constructive possession); *Carter*, 696 N.W.2d at 40 (observing that failure to stop immediately is suspicious activity). Of course, not all responses to police conduct support inferences of knowledge and possession. *See Royer*, 460 U.S. at 498, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236 (holding that, although a police officer is free to question or approach a suspect without grounds for a stop, the suspect's choice to walk away and not listen to the officer "does not, without more, furnish those grounds"). On the other hand, unreasonable behavior can be relevant. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570, 576 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). In this case, we have found the officers' conduct in taking DeWitt by the arm to conduct their investigation outside the store was reasonable. Detective Morel stated that he wanted to ask DeWitt some questions outside about a drug investigation prior to DeWitt attempting to break away from the officers. The officers interpreted this reaction as attempted flight. Thus, DeWitt's reaction in attempting to break away and flee caused increased suspicion and further evidence DeWitt was involved with the drug delivery they suspected before approaching him.

Finally, we turn to the testimony at trial by Detective Gilbert Proehl, the detective leading the unit, and Detective Morel indicating they received information from a confidential source that DeWitt was planning to make a drug delivery at Walmart and that the information they received was corroborated by the circumstances they observed when DeWitt arrived at the store. The State did not call the confidential informant as a witness at trial, and DeWitt claims the testimony of the officers cannot be considered in determining constructive possession because it was hearsay. DeWitt also claims there is insufficient evidence of constructive possession without the background evidence from the confidential informant that he intended to sell drugs at the store rather than purchase fishing equipment.

At trial, DeWitt objected to the testimony of Detective Proehl as hearsay. The district court sustained the objection, but permitted Detective Proehl to generally testify that he received information from a confidential source to explain the reason police went to Walmart. *See* Iowa R. Evid. 5.801(c) (defining "hearsay" as a statement offered to prove the truth of the matter asserted, which excludes statements offered to explain conduct); *see also State v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990) (noting that a statement is not hearsay if it is offered only to explain responsive conduct of the listener). This information was relevant to show why the detectives approached DeWitt in the store rather than another customer displaying similar behavior. *Mitchell*, 450 N.W.2d at 832 (recognizing if nonhearsay statements are used to prove responsive conduct, such conduct must be relevant to some aspect of State's case). Detective Morel then testified about the specific information provided by the confidential informant without objection by DeWitt. *Tamm, Inc. v. Pildis*, 249 N.W.2d 823, 834 (Iowa 1976) ("[T]he

proper rule to be adhered to in this state is that when hearsay evidence which would be objectionable and incompetent when properly objected to is admitted without objection and is relevant and material to an issue[,] it is to be considered and given its natural probative effect as if it were in law competent evidence. Its weight is to be determined by the trier of fact by the same criteria as is employed in considering other competent evidence."). Consequently, the evidence was properly considered by the district court and is properly considered for the purpose of determining the sufficiency of the evidence supporting constructive possession.

Our review of substantial evidence to support a judgment for conviction requires that we " 'view the "evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonable be deduced from the record evidence." ' " *Carter*, 696 N.W.2d at 36 (quoting *State v. Quinn,* 691 N.W.2d 403, 407 (Iowa 2005)). Under the facts and circumstances of this case, we find the evidence was sufficient to support DeWitt's conviction.[5]

---

[5]The State also argues that knowledge of the marijuana may be inferred based on its value. Courts take differing approaches on this point. *Compare Commonwealth v. Garcia*, 569 N.E.2d 385, 392 (Mass. 1991) (holding that the value of cocaine located in the trunk of a car in joint possession was irrelevant to the element of possession), *with United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986) (holding that the high value of drugs in a vehicle supported knowing possession because "it is unlikely that the owner of the truck, or anyone else, would have left such a valuable substance in the truck"). In *Garcia*, the Supreme Judicial Court of Massachusetts considered an argument similar to the one the State puts forth here and said:

> The Commonwealth contends that an additional factor pointing to knowledge can be found in the fact that the cocaine was extremely valuable. The Commonwealth argues that it is unlikely that anyone would lend a vehicle containing such valuable contents unless the borrowers knew of those contents, and that therefore a jury could infer that both Heredia and Garcia knew of the cocaine. This argument is simply another way of stating that one can infer knowledge of contraband from its presence in a vehicle.

569 N.E.2d at 392. We find the approach taken by Massachusetts more persuasive. Allowing the value of the drugs to support an inference of knowing possession risks

## V. Conclusion.

After considering all issues raised on appeal,[6] we affirm the decision of the court of appeals and judgment and conviction of the district court.

**DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT AND SENTENCE OF DISTRICT COURT AFFIRMED.**

All justices concur except Mansfield, J., who takes no part.

---

collapsing the inquiry to one of proximity. Proximity is insufficient to support an inference of knowledge and control in Iowa. *See Atkinson*, 620 N.W.2d at 3.

[6]The court of appeals decision stands as the final decision with respect to the remaining two sufficiency-of-evidence claims as well as the ineffective-assistance-of-counsel claim. *See State v. Johnson*, 784 N.W.2d 192, 193 n.1 (Iowa 2010).