**IN THE COURT OF APPEALS OF IOWA**

No. 13-1997
Filed March 11, 2015

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**TAQUALA MONIQUE HOWSE,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Black Hawk County, Jeffrey Harris, District Associate Judge.

    Taquala Howse appeals her conviction of carrying weapons, an aggravated misdemeanor, in violation of Iowa Code section 724.4 (2011). **REVERSED.**

    John Audlehelm of Audlehelm Law Office, Des Moines, for appellant.

    Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Emily Zerkel, Assistant County Attorney, for appellee.

    Considered by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, C.J.**

Taquala Monique Howse appeals her conviction for carrying weapons, an aggravated misdemeanor in violation of Iowa Code section 724.4 (2011). She contends the stun gun found in her purse does not qualify as a dangerous weapon and thus her conviction cannot stand. By statutory definition, "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person" is a "dangerous weapon." Iowa Code § 702.7. Because the record does not contain evidence that the stun gun found in the defendant's purse "produces a high-voltage pulse designed to immobilize a person," we reverse her conviction.

**I. Background Facts and Proceedings.**

On June 23, 2013, police responded to a report of a theft at a Waterloo store. Howse was identified as a suspect and arrested. She was handcuffed, escorted by police to a squad car, and searched. Officer Kyle Jurgensen found a "small hand-held stun gun" in Howse's purse, which Howse stated she had purchased. She stated she "carried it to clubs and whatnot." When asked if she had a permit to carry the stun gun she said "no." Howse was charged with carrying weapons.

At the bench trial, Officer Jurgensen testified a stun gun emits an electrical current and is able to incapacitate someone. He testified the stun gun found in Howse's purse "appeared to be all there—all the components of a stun gun." He had not tested the stun gun however. When asked why, he stated: "A stun gun, to me, is dangerous. I didn't know the condition or maintenance the defendant has done with her stun gun, so I didn't want to test it in my hand."

The court asked, "Depending on the physiology of the victim and the number of times a stun gun might be administered, would a stun gun be capable of administering serious bodily injury and/or death?" Officer Jurgensen testified a stun gun is capable of administering serious bodily injury and, perhaps death under certain circumstances: "I mean, there would have to be some prior conditions to that. . . . You know, depends if there's drugs in the system, heart conditions. I mean, you know, environment, everything plays a factor." He stated that such devices were designed to incapacitate a person, though "there has been documented deaths using Tasers and stun guns, but like I said, there have been other preconditions. I mean, stun guns and Tasers were not put on the market to kill people."

Officer Greg Erie, a field training officer, defensive tactics instructor, and Taser instructor with the Waterloo Police Department, testified he had previously examined the stun gun and "if it functioned properly" it would emit an electrical current. He testified that if one was touched with a stun gun, "it is just like being electrocuted." He also testified that officers are taught to avoid the head and neck area when employing their stun guns because of foreseeable injuries. He distinguished a taser from a stun gun stating a taser will immobilize a person. He described the function of a stun gun as a "compliance tool"—once an individual feels the shock they jump back. Officer Erie also testified he did not "have any background with this one," did not know how many volts this device emitted, and "couldn't get [this device] to work."

In closing, the State argued it had proved the three elements of the offense, that is,

First, the state has established proof beyond a reasonable doubt that the defendant violated all three elements of the offense of Carrying Weapons and that on or about June 23rd, 2013, the defendant was armed with a stun gun. The stun gun was concealed on or about the defendant's person, and the stun gun was a dangerous weapon.

. . . .

. . . [R]egarding the third element and the fighting issue in this case, the state offered proof that a stun gun is a dangerous weapon. The defendant herself admitted she carried the stun gun for purposes of defending against attack. Officer Jurgensen testified that he did not test the weapon, because it would be dangerous to do so, as well as the specialist, Greg Erie, testified that such a device is used for training police officers, and that it has the possibility of inflicting pain and injury on individuals.

The prosecutor quoted section 702.7, which defines a dangerous weapon as including "any portable device or weapon directing an electrical current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." The prosecutor argued, "By so construing the language of the statute, quote, 'the legislature sought to establish a broad, flexible definition of "dangerous weapons,"' as recognized by Justice Cady in *State v. Pearson*, 547 N.W.2d 236, and that's Iowa 1996." She added the anticipated defense argument that the device was inoperable was "not determinative," citing *State v. Hemminger*. *See* 308 N.W.2d 17, 20 (Iowa 1981) ("The definition of 'dangerous weapon' goes to the character of the instrument utilized. Thus, working condition should never be an issue where the instrument employed has the character of a dangerous weapon." (internal citation omitted)).

Defense counsel countered with a "twofold" argument: first, "that in order to be convicted of Carrying Weapons or carrying a concealed stun gun, the State's got to show, first of all, that this is a stun gun which produces a high-voltage pulse designed to immobilize a person." And secondly, "the State [must]

prove that the device is capable of inflicting death when used in the manner for which it was designed."

On December 5, 2013, the district court issued its ruling, which provides in part:

> 3. Under the terms of section 702.7 Code of Iowa, "dangerous weapons" include "any portable device or weapon directing an electric current, pulse, wave or beam that produces a high-voltage pulse designed to immobilize a person." The State of Iowa has no affirmative burden to produce evidence as to how much high voltage a particular device will emit or produce.
> 4. The Iowa legislature has acknowledged the dangerous nature of taser and/or stun gun . . . .
> 5. The court must look to the appellate decisions which address the "dangerous weapon" language of section 702.7 Code of Iowa as it involves loaded and unloaded revolvers for guidance as well as the sole appellate decision involving an employed stun gun, *State v. Geier*, 484 N.W.2d 167 (Iowa 1992), cited by the parties as authority.
> 6. The court accords significant weight to the "capability requirement" outlined in the Iowa Supreme Court decision issued in *State v. Nichols*, 276 N.W.2d 416 (Iowa 1979).
> 7. Serious injury and/or death can be inflicted by a stun gun administered to a person who is vulnerable because of a weakened heart; heart condition; or drugs in the victim's system. As such, serious injury and/or death can come based upon the following:
> > a. administration of the stun to the head or neck of a potentially vulnerable victim;
> > b. prolonged administration of the stun gun to the head or neck of a victim;
> > c. a victim's prior condition(s) that would make him/her vulnerable to the stun.
> 8. Based upon the credible matters presented, the court finds that the State of Iowa has presented substantial evidence to establish the essential elements of the charged offense beyond a reasonable doubt.

Howse appeals.

**II. Scope and Standard of Review.**

"To the extent our review . . . requires us to interpret the meaning and scope of a particular statute, our review is for correction of errors at law." *State v. Anspach*, 627 N.W.2d 227, 231 (Iowa 2001); *accord State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013).

> "When reviewing such issues we are not bound by the trial court's determinations of law." Where the defendant also challenges the sufficiency of the evidence to support his conviction under the statute, "we review the evidence to determine whether a rational trier of fact could have found the defendant guilty of the offense charged" beyond a reasonable doubt. Thus, our review of all the evidence in the record is made in a light most favorable to the State.

*Anspach*, 627 N.W.2d at 231 (citations omitted); *see also State v. Jorgensen*, 758 N.W.2d 830, 834 (Iowa 2008).

**III. Discussion.**

Iowa Code section 724.4(1) provides, "Except as otherwise provided in this section, a person who goes armed with a dangerous weapon concealed on or about the person . . . commits an aggravated misdemeanor."

On appeal, Howse contends that as a matter of law or fact the stun gun found in her purse does not qualify as a "dangerous weapon" under section 702.7, and thus her conviction is not supported by substantial evidence.[1]

---

[1] We reject the State's preservation-of-error argument, which promotes form over substance. It is true, "[w]e do not review issues that have not been raised or decided by the district court." *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). The State's complaint that rules of preservation must be upheld or the State is "unfairly hamstr[ung]" and "blindside[d]" ring hollow here. Whether addressed as a matter of statutory interpretation or sufficiency of the evidence, the question argued and decided by the trial court is whether the stun gun found in Howse's purse comes within the statutory definition of a "dangerous weapon."

Iowa Code section 702.7 defines dangerous weapons. That provision reads:

> A "dangerous weapon" is any instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed, except a bow and arrow when possessed and used for hunting or any other lawful purpose. Additionally, any instrument or device of any sort whatsoever which is actually used in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, when so used, is capable of inflicting death upon a human being, is a dangerous weapon. Dangerous weapons include but are not limited to any offensive weapon, pistol, revolver, or other firearm, dagger, razor, stiletto, switchblade knife, knife having a blade exceeding five inches in length, or any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person.

Section 702.7 thus provides three paths by which a weapon may be deemed dangerous: (1) a device which is "*designed primarily for use* in inflicting death or injury upon a human being or animal, *and* which is *capable of inflicting death* upon a human being when used in the manner for which it was designed" (but excepting a bow and arrow under certain circumstances); (2) a device "which is *actually used* in such a manner as to indicate that the defendant intends to inflict death or serious injury upon the other, and which, *when so used, is capable of inflicting death upon a human being*, is a dangerous weapon"; and (3) devices listed that are statutorily determined to be dangerous weapons per se, one of which is "any portable device or weapon directing an electric current, impulse, wave, or beam that produces a high-voltage pulse designed to immobilize a person." Only the first and third are relevant to the case at hand; the second requires a device that is actually used, which has no bearing here.

In *Geier*, 484 N.W.2d at 171-72, the supreme court considered whether a stun gun fell within the definition of a "dangerous weapon" pursuant to the first path noted above (designed primarily for use in inflicting death or injury and which is capable of inflicting death) and concluded "there was sufficient evidence adduced at trial to convince a rational trier of fact that a stun gun is a 'dangerous weapon' under the aforementioned statutory definition." The court noted:

> Deputy Muir testified that the stun gun uses a nine volt battery to create an arc of electricity that ranges from 30,000 volts up to 65,000 volts thereby imparting a shock to the recipient. Clearly, a shock resulting from an electric charge that may range as high as 65,000 volts is a "device designed primarily for use in inflicting . . . injury," which is described by the Model Penal Code as "physical pain . . . or an impairment of physical condition." . . . Deputy Muir also indicated that the stun gun is capable of causing death if used in the head or neck region. Deputy Muir's testimony exceeds the threshold necessary to sustain the court's finding that a stun gun is a "dangerous weapon" as that term is defined in section 702.7.

*Geier*, 484 N.W.2d at 171.

The trial court here found that generally a stun gun is capable of causing death. But unlike the evidence presented in *Geier*, there was no evidence as to the power of the stun gun here. Officer Jurgensen did not test the stun gun, and Officer Erie specifically stated he had no background with this particular small stun gun and he "couldn't get it to work." Without some evidence of the capabilities of this particular stun gun, there is not substantial evidence to support a finding that it was "designed primarily for use in inflicting . . . injury" as was the case in *Geier*. Consequently, unless the evidence supports a finding that the stun gun was a dangerous weapon per se under the third path of section 702.7, Howse's conviction cannot stand.

After *Geier* was decided, the legislature amended the list of per se dangerous weapons to included "any portable device or weapon directing an electric current, pulse, wave or beam that produces a high-voltage pulse designed to immobilize a person." While we might agree in principle with the trial court that the State is not required to "produce evidence as to how much high voltage a particular device will emit or produce," we do conclude that to qualify under the per se dangerous weapons listing, there must be *some* evidence the device "produces a high-voltage pulse designed to immobilize a person." Here, the State's witnesses' testimony related to stun guns in general not this specific device. Nothing in this record establishes, even in general terms, the voltage of the device at issue—high, low, or in-between, and if it had sufficient voltage to immobilize a person.

We conclude there is not substantial evidence in this record to sustain the conviction. We therefore reverse.

**REVERSED.**