# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1262
Filed January 28, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,

v.

**Carl Allen Castillo II,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Lawrence McLellan, Judge.

———————————

**AFFIRMED**

———————————

Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines,
attorney for appellant.

Brenna Bird, Attorney General, and Sheryl A. Soich and Anagha Dixit
(until withdrawal), Assistant Attorneys General, attorneys for appellee.

———————————

Considered without oral argument
by Tabor, C.J., Badding, J., and Telleen, S.J.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

An unhoused individual challenges his convictions for failing to register as a sex offender and providing false information to the sex offender registry. He contends that the State failed to offer sufficient proof that he did not pitch his tent under the Grand Avenue bridge in West Des Moines, as he told authorities. Viewing the evidence in the light most favorable to the district court's verdicts, we find substantial evidence to support the convictions.

## I.     Facts and Prior Proceedings

Carl Castillo moved to Iowa from California in the summer of 2022. Three years earlier, he pleaded guilty to sexual battery. That California felony conviction required him to register as a sex offender in Iowa.

In May 2023, Castillo informed the Polk County Sheriff's Office that he "got kicked out" of the place where he was staying. He reported being unhoused and staying in "a brown or camo tent underneath the bridge area" just off 22nd Street in West Des Moines.

Both housed and unhoused sex offenders are required to register under Iowa Code chapter 692A (2024). *State v. McCullough*, No. 08-1380, 2009 WL 2185549, at *4 (Iowa Ct. App. July 22, 2009) (finding purpose of statute was "to facilitate monitoring of those offenders by law enforcement and the public"). To that end, the definition of residence in the sex offender registry chapter includes "any mobile or transitory living quarters." Iowa Code § 692A.101(24).

Geoff Herselius, an identification technician, explained how the Polk County Sheriff's Office typically keeps track of sex offenders who do not have a permanent residence:

> [W]e pull up a Google Maps image and we zero down the area that they're saying that they're at. We have them point out where the general location is and we have them circle it, and that's kind of how we have a baseline of the general area of where they're going to be—their campsites are—so the street detectives have a shorter area to look in.

To monitor these unhoused sex offenders, Herselius said, "[W]e block off a two-hour increment every Wednesday morning for them to come in." During Castillo's weekly check-ins, he did not report a change in the location of the campsite that he originally circled on the map.

More monitoring fell to Deputy Ian Cory, who conducted compliance checks as part of his regular duties. He testified, "[W]e will go around and verify the residency of the 1,000-plus sex offenders that we have in Polk County. We do spend a little bit of extra time on anybody that's registered as homeless just because they're transient in nature." Castillo was on Cory's compliance check list. In December 2023, Deputy Cory made eighteen trips to the Grand Avenue bridge area where Castillo said he was camping.[1] The first check was at 8:00 p.m. on December 7 and the last check was at 11:15 p.m. on December 28. The trips between occurred on twelve dates, generally during daytime hours. Deputy Cory testified that he started all the compliance checks from a sloped area on the side of a bike trail. From that

---

[1] Deputy Cory's partner Nicholas Smith also did one compliance check for a total of nineteen visits.

vantage point he could "see pretty well" down through the brush toward the creek.[2]

None of the compliance checks confirmed that Castillo had been camping in that area. Castillo was never present. And Deputy Cory saw no tent, no campfire, nor any remnants of a campfire. Cory said he would have expected "some to probably have a fire, since most of those nights were below freezing." Even if Castillo had packed up his belongings during the day, the deputy saw no signs of a campsite, no clearing for a tent to be set up, nor any evidence of "flattened grass" where a tent had been pitched. Deputy Cory checked both sides of the bridge and both banks of the creek at the location identified by Castillo but saw no trace that anyone had camped there. On cross-examination, the deputy acknowledged that he did not gather any evidence that Castillo was living somewhere else.

The State charged Castillo with two aggravated misdemeanors, violating the sex offender registry and providing false information to the registry. *See id*. §§ 692A.104(2), .111(1), .112. At his bench trial, Castillo testified that he had been sleeping near the bridge that he reported as his residence every night that December. But beyond sleeping, he maintained that he did not spend much time there. He told the court that he packed up his tent every morning and repitched it every night. He offered a photo

---

[2] The State presented Cory's body cam footage from the checks conducted on December 21 and 28 so the court could see what the deputy saw.

exhibit of a green camo carrier case for the tent and a video exhibit of him setting up the tent in less than five minutes.[3]

In his testimony, he described an average day:

> I would wake up between four and six a.m., go for a walk, maybe wash my face in the river, relax for a little bit, wait until the nearest coffee shop opens, grab a cup of coffee, and relax for a good hour or so give or take. Then I would go out and look for work. . . . About six to eight p.m. I usually stop looking for work because hiring managers don't work about that time. So I spend time with my girlfriend. We go to the mall, go out to eat, stuff like that.

Castillo testified that he would eventually make it back to the campsite between 11:00 p.m. and 2:00 a.m. Addressing the deputy's testimony that he didn't find any traces of a campfire, Castillo denied starting fires. In his words, "I know the fire safety and I don't like to litter fire and spread fire, because I don't want to burn the forest down. I'm not really experienced with fire. So to keep myself warm, I layered myself up with coats and pocket warmers."

After the bench trial, the court found Castillo guilty on both counts. It found "no evidence the area Castillo claimed he lived was inhabited." The court did not find credible Castillo's testimony that "he was simply not there when the nineteen compliance checks were conducted." The court merged

---

[3] At trial, the State pointed to the pristine look of the tent in the defense exhibits.

[Castillo] testified that the tent in Defense Exhibit B was the tent he used to sleep in every night from June through December, outside at the location near the bridge at 2120 Grand Avenue. In reviewing Defense Exhibit B, [Castillo's] tent appears in very good (nearly new) condition. In fact, it still has creases as though it was just taken out of the box for the first time. This does not look like a tent that was outside every night for six-plus months; exposed to the wind, rain, and snow.

the two counts for purposes of judgment and sentence. Castillo received a suspended two-year sentence. He appeals those verdicts.

## II. Scope and Standard of Review

We review "challenges to the sufficiency of the evidence for the correction of legal error." *State v. Lacey*, 968 N.W.2d 792, 800 (Iowa 2021). Because Castillo waived his right to a jury trial, the district court's fact findings "have the effect of a special verdict." *See* Iowa R. App. P. 6.907. If those findings are supported by substantial evidence, they are binding on appeal. *State v. Mumford*, 14 N.W.3d 346, 356 (Iowa 2024). Evidence qualifies as substantial if it could convince a rational trier of fact that Castillo is guilty beyond a reasonable doubt. *State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). In deciding Castillo's substantial-evidence challenge, we view the record in the light most favorable to the court's decision. *See id.*

## III. Analysis

Castillo insists that in December 2023 the area under the Grand Avenue bridge was his lawful residence under Iowa Code section 692A.101(24), and the State failed to carry its burden to show he did not "sleep or habitually live" there.

We start with the statutory definition:

> "Residence" means each dwelling or other place where a sex offender resides, sleeps, or habitually lives . . . . If a sex offender does not reside, sleep, or habitually live in a fixed place, "residence" means a description of the locations where the offender is stationed regularly, including any mobile or transitory living quarters. "Residence" shall be construed to refer to the places where a sex offender resides, sleeps, habitually lives, or is stationed with regularity, regardless of whether the offender declares or characterizes such place as the residence of the offender.

Iowa Code § 692A.101(24).

6

To prove that Castillo violated the sex offender registry requirements, the State had to prove that he (1) was required to register and (2) failed to report a change of residence within five business days. *See id.* § 692A.104(2). To prove the second count, the State had to show that Castillo "knowingly provide[d] false information upon registration, change of relevant information, or during an appearance to verify relevant information." *Id.* § 692A.112.

Castillo contends the State did not prove either violation because it lacked evidence that he was not sleeping or habitually living at the transitory quarters he reported to the sheriff. In his view, it was not enough to show he was not physically present at the location during Deputy Cory's compliance checks. Especially when most of the checks were done during "business hours." Attacking the adequacy of the investigation, Castillo argues, "The notion that a homeless person, lacking basic utilities like heat and water, would voluntarily remain under a bridge during the daytime in the dead of winter defies common sense."

Castillo concedes that the district court could choose to disbelieve his testimony. *See State v. Dewitt*, 811 N.W.2d 460, 476 (Iowa 2012) ("[C]redibility determinations are an essential function of the fact finder."). But he adds that the State must still have something to offer "on the other side of the ledger to indicate he slept or habitually lived elsewhere."

We agree the State cannot rely solely on the court's disbelief of Castillo's testimony. But the State *did* present affirmative evidence that Castillo violated the registry requirements. In considering whether the State offered substantial evidence to show Castillo was *not* sleeping or habitually living where he said he would be, we observe that "as a practical matter it is never easy to prove a negative." *See Elkins v. United States*, 364 U.S. 206, 218

(1960). And it's even harder to prove a negative beyond a reasonable doubt. But the State's case crossed that threshold.

As we said in *McCullough*, the registry's purpose is to allow law enforcement and the public to monitor the whereabouts of sex offenders, even unhoused offenders. 2009 WL 2185549, at *4. Law enforcement tried to do that here. Deputy Cory and his partner made nineteen trips to Castillo's alleged campsite in eleven days. No sign of Castillo. And no trace of a campsite. A reasonable factfinder could infer from those fruitless compliance checks that Castillo either gave the registry false information about where he was living or changed his residence without providing notice.

What's more, a reasonable factfinder could reject Castillo's explanation that—after a day of job hunting, spending time with his girlfriend, and eating out—he returned to the campsite for as little as two hours a night and never lit a fire to keep warm in December. We will not find evidence insubstantial where reasonable minds may draw different conclusions from the record. *State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006). The ultimate question is whether the State's evidence supports the district court's finding not whether the evidence would support a different finding. *Id.* Viewing the evidence in the light most favorable to the district court's judgment, we find sufficient proof to preserve the verdicts.

**AFFIRMED.**