HECHT, Justice
(dissenting).
Police officers standing outside Raymond Norvell’s residence observed Isaiah Henderson inside smoking marijuana. After knocking on the door, announcing their presence and entering the residence, the officers found several persons, drug paraphernalia near several of the persons, and marijuana and crack cocaine. Tremayne Thomas, one of the persons found inside the residence, who was neither a resident at the apartment nor the person whom the officers had observed moments earlier through the window smoking marijuana there, was convicted of possession of the marijuana and crack cocaine with intent to deliver the drugs. In an opinion faithfully applying this court’s decisions on the doctrine of constructive possession, the court of appeals concluded the State failed to produce sufficient evidence supporting Thomas’s conviction. As I believe the court of appeals got it right, I respectfully dissent.
I begin with a brief overview of the applicable law. Iowa Code section 124.401 makes it unlawful “to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance.” Iowa Code § 124.401(1) (2011). We have explained that to establish possession of a controlled substance for purposes of this provision, the State must prove an accused has exercised dominion and control over the substance, had knowledge of its presence, and had knowledge of the identity of the substance. State v. Maxwell, 743 N.W.2d 185, 193 (Iowa 2008). In explicating the meaning of these requirements, we have frequently maintained proof of access to a place where a substance is found cannot by itself support a finding of unlawful possession. See State v. Cashen, 666 N.W.2d 566, 572 (Iowa 2003) (“Simply because a person can reach out and grasp something does not mean he or she has control or dominion over the object.”); see also Maxwell, 743 N.W.2d at 194; State v. Bash, 670 N.W.2d 135, 137 (Iowa 2003); State v. Webb, 648 N.W.2d 72, 77 (Iowa 2002) (quoting State v. Reeves, 209 N.W.2d 18, 22 (Iowa 1973)).
Instead, we have often noted the State may employ either of two formulations of proof in its attempt to establish possession. When a substance is found on an accused’s person, we have described the concept as “actual possession,” and noted the State may present direct evidence of actual possession in making its case. Alternatively, we have also explained the State need not establish possession by direct evidence of actual possession, and instead, the State may present its case based on a theory of “constructive possession.”[3] The doctrine of constructive possession has been characterized as “a legal fiction used by courts to find possession in situations where it does not in fact exist, but where they nevertheless want an individual to acquire the legal status of possessor.” Charles H. Whiteb-read & Ronald Stevens, Constructive Pos *449 session in Narcotics Cases: To Have and Have Not, 58 Va. L.Rev. 751, 761-62 (1972) [hereinafter Whitebread & Stevens].
The concept of constructive possession is used to modestly extend the concept of actual possession and include under its umbrella those cases where the inference of possession at some time in the past is exceptionally strong. See State v. Barber, 135 N.M. 621, 92 P.3d 633, 638 (2004); see also Reeves, 209 N.W.2d at 22 (expounding constructive possession principles and explaining “if the accused does not have exclusive control of the hiding place possession may be imputed if he has not abandoned the narcotic and no other person has obtained possession”); 1 Wayne R. LaFave, Substantive Criminal Law § 6.1(e), at 433 (2d ed. 2003) (“Constructive possession ... is simply a doctrine used to broaden the application of possession-type crimes to situations in which actual physical control cannot be directly proved.... ”). A showing of constructive possession, we have said, requires the State to establish an accused has knowledge of the presence of the substance and has the authority or right to maintain control of the substance. See Maxwell, 743 N.W.2d at 193. In some cases, as where an accused exclusively possesses the premises where a substance is discovered, an accused’s authority or right to maintain control might be inferred. Reeves, 209 N.W.2d at 23. Even when the inference is established in those cases, however, we have cautioned the inference is rebuttable and not conclusive. Id.
We have cautioned even more strongly against the inference of possession when an accused has not been in exclusive possession of the premises, and we have mandated the accused’s knowledge of and ability to control a substance must be established by proof beyond presence on the premises or mere physical proximity to contraband found there. See id.; see also State v. Kern, 831 N.W.2d 149, 161 (Iowa 2013). In these “joint” possession or occupancy cases, we have explained the State must typically present proof of immediate and exclusive possession of the place where drugs are found on a premises, and additional proof such that we can be satisfied the accused has possessed the substance for purposes of the statute. Reeves, 209 N.W.2d at 23. That additional proof may take the form of proof of incriminating statements made by the accused, incriminating actions upon the police’s discovery of the substance among the accused’s belongings, fingerprints on the packaging containing the substance, and any other circumstances establishing a possessory link between the accused and the substance. Maxwell, 743 N.W.2d at 194. Regardless whether the actual possession or constructive possession formulation is advanced by the State, however, our purpose in setting forth these formulations and evidentiary factors for consideration has always been to ensure the State can establish, by something more than speculation, that the accused has actually exercised possession of the substance recovered beyond a reasonable doubt.[4] See Reeves, 209 N.W.2d at 21 *450 (explaining unlawful possession must be established by proof “the accused exercised dominion and control (i.e., possession) over the contraband”).
When reviewing findings of guilt in possession cases, we will uphold the findings when substantial evidence supports the verdict beyond a reasonable doubt. See Kern, 8B1 N.W.2d at 158. We review the evidence presented at trial in the light most favorable to the State, but we consider all the evidence in the record and not just the evidence favoring the State. Id. We have often observed direct or circumstantial evidence of possession may eonsti-tute substantial evidence for purposes of our review. See, e.g., Reeves, 209 N.W.2d at 21. We have also routinely said circumstantial evidence may often be equally as or even more persuasive than direct evidence in any given case. See, e.g., State v. Hearn, 797 N.W.2d 577, 580-81 & n. 1 (Iowa 2011) (noting aiding and abetting must be proven by same evidentiary standard regardless whether evidence is direct or circumstantial and finding substantial evidence of defendant’s active participation in crime); State v. Bentley, 757 N.W.2d 257, 262-63 (Iowa 2008) (explaining, in kidnapping case, State need not “affirmatively *451 disprove” any hypothesis someone other than accused removed victim where evidence indicated accused was only occupant of house other than victim’s sleeping grandmother and younger siblings); State v. Radeke, 444 N.W.2d 476, 479 (Iowa 1989) (noting direct evidence and circumstantial evidence may be equally probative and concluding evidence of defendant’s use of threats and force to induce victim to unbutton her blouse was sufficient to allow jury to find defendant had intent to commit sexual assault beyond a reasonable doubt).
We have also explained, however, that in possession cases where the State fails to present evidence an accused possessed the proscribed items at the time of arrest, and instead aims to prove possession at some time prior, the evidence of past possession “ ‘must be entirely consistent with defendant’s guilt, wholly inconsistent with any rational hypothesis of his innocence, and so convincing as to exclude any reasonable doubt that defendant was guilty of the offense charged.’ ” Reeves, 209 N.W.2d at 21 (quoting State v. Schurman, 205 N.W.2d 732, 734 (Iowa 1973)); see also State v. McDowell, 622 N.W.2d 305, 308 (Iowa 2001) (overturning conviction in case where State presented evidence of defendant’s frequent dominion and control of portions of another’s bedroom where gun was found, but failed to present any evidence specifically linking defendant to the gun); Whitebread & Stevens, 58 Va. L.Rev. at 763 (explaining even evidence of “exclusive dominion and control” cannot justify a finding of possession in the absence of “evidence establishing the fact that no one else could have exercised control over the drugs”); cf. Webb, 648 N.W.2d at 81 (explaining evidence must have a ‘“visible, plain, or necessary connection’ ” with possession (quoting Black’s Law Dictionary 1295 (6th ed.1990))); State v. Atkinson, 620 N.W.2d 1, 5-6 (Iowa 2000) (examining case involving “impermissible pyramiding of inferences” and overturning conviction despite evidence of evasive movement and proximity to and knowledge of substances, because any inference about defendant’s exercise of control would have been “based on pure speculation” (quoting State v. Snyder, 635 So.2d 1057, 1058 (Fla.Dist.Ct.App.1994) (first quote))).
This demanding standard for proof of possession must be met, we have explained, because we must ensure the evidence — whether direct or circumstantial and whether characterized as actual or constructive — generates something more than an inference of suspicion and instead raises a real inference of guilt beyond a reasonable doubt. See Reeves, 209 N.W.2d at 21; see also State v. Vance, 790 N.W.2d 775, 783 (Iowa 2010) (noting evidence is substantial only if it would convince rational trier of fact of guilt beyond a reasonable doubt); cf. United States v. Hernandez, 301 F.3d 886, 893 (8th Cir.2002) (“[Tjhere is a critical line between suspicion of guilt and guilt beyond a reasonable doubt.”); Parker v. Renico, 450 F.Supp.2d 727, 735 (E.D.Mich.2006) (“Here, while the evidence may have lead to a ‘reasonable speculation’ that the [accused] was in possession ..., without stacking inferences there is insufficient evidence to prove [possession] beyond a reasonable doubt....”).
This court’s decisions applying the court-created doctrine of constructive possession reveal a cautious, but very sound, jurisprudential approach. When the defendant in a drug case is not found to have actual possession of contraband, we have held a conviction cannot stand in the absence of proof beyond a reasonable doubt the defendant — rather than someone else who is present with the defendant — actually possessed the contraband at some prior time. Thus, when a residence or vehicle containing an illegal substance is occupied *452 by more than one person, we have required more than inference piled upon inference amounting ultimately to mere speculation supporting a finding that the defendant, rather than someone else present at the time, exercised dominion and control over the illegal substance. In my view, the majority’s conclusion the evidence was sufficient to support a finding Thomas — rather than others present in Norvell’s apartment — possessed the marijuana and cocaine found there sometime before the officers arrived relies not on legitimate inference countenanced by our prior caselaw, but instead on multiple inferences amounting to speculation.
Approaching the matter in chronological order, I begin with what the officers knew about possession of illegal drugs in this case before they entered Norvell’s apartment. One of the officers heard a female voice — apparently that of Ledbetter, the only female in the apartment — scolding another occupant for interacting with the police too cavalierly and thereby risking arrest when the officers had stopped at the front door minutes earlier. One could at least speculate that Ledbetter was concerned about the prospect of being arrested because she knew illegal drugs were present in Norvell’s apartment. While peering through the window, the officers had watched Henderson — not Thomas— smoking marijuana while standing near the microwave in the kitchen of the apartment.
When the officers entered the apartment, they first encountered Ledbetter, Norvell, and Derek Townsend, who were seated at the kitchen table. On that table were a spoon with cocaine residue on it and several small, empty, clear plastic bags. Thus, before the officers entered the bedroom and arrested Thomas, they saw Henderson smoking marijuana and passed by Norvell — the only resident of the apartment — and two other persons seated around a table in close proximity to evidence that cocaine, and perhaps other drugs, had been used there recently.
There was no direct evidence linking Thomas to the marijuana and cocaine found in Norvell’s bedroom atop one of Norvell’s purses located there on the floor. No fingerprints were found on the sandwich bag, or the individual plastic bags within it, and no other drug paraphernalia was found in the room. There was no testimony from any witness who claimed to have seen Thomas throw or place the small, clear plastic bags in the location where they were found. The majority nonetheless finds inferences from circumstantial evidence sufficient to support the conviction. I will explore each of the circumstances in turn.
As the officers entered the apartment, Henderson and Thomas moved from the front room — a combined living and kitchen area in view of the front door — into Nor-vell’s bedroom. The evidence is undisputed Henderson entered the bedroom first, followed by Thomas. The majority concludes a reasonable juror could infer that Thomas had the marijuana and cocaine on his person when the officers entered the apartment, and he went into the bedroom to get rid of them. I believe the majority’s inference on this point is based on sheer speculation under the circumstances presented here. Henderson, the only person the officers had seen actually using marijuana, entered the bedroom before Thomas.[5] He testified he had never seen Thom *453 as holding the drugs. The other three occupants, who had been found within arm’s reach of small plastic bags like those found in the bedroom, likewise gave no indication they had ever seen Thomas holding or accessing the drugs. On these facts, I conclude Henderson’s possession was equally consistent with the State’s theory the drugs eventually discovered had been recently discarded.[6] See Cashen, 666 N.W.2d at 572-73 (overturning conviction in part because “[t]he other three passengers riding in the back seat were just as close to the drugs as was Cashen”); Webb, 648 N.W.2d at 79 (“None of these items were found in a place that was immediately and exclusively accessible to Webb and subject to his dominion and control.”).
Moreover, as I have noted, Norvell, the only resident of the apartment, and two other persons were seated at the table where the spoon containing cocaine residue and small plastic bags were located. No one saw either Henderson or Thomas drop or throw the marijuana and cocaine on Norvell’s purse as the two entered the bedroom. Accordingly, I conclude Thomas’s movement into the bedroom behind Henderson upon the officers’ entry raises no credible inference stronger than speculation that Thomas more likely than any other person present exercised dominion and control over the drugs at some prior time.
The majority also suggests it is significant no other person in Norvell’s apartment claimed knowledge or ownership of the marijuana and cocaine found in Nor-veil’s bedroom. If I found this circumstance supportive of an inference of Thomas’s guilt, perhaps I might also consider significant the fact that Henderson explicitly testified he had no reason to believe Thomas had controlled the drugs. No comparable testimony was advanced regarding the other occupants and their connection to the contraband. I do not, however, find any part of this evidentiary picture in which no other occupant claimed knowledge or ownership surprising or significant, and I do not find it supportive of an inference even remotely approaching reliability tending to prove Thomas — more likely than any other person present — exercised dominion and control over the contraband.
Nor do I share the majority’s willingness to countenance an inference that Thomas must have hurriedly deposited the drugs on Norvell’s purse upon entering the bedroom because drug dealers do not normally leave their drugs in plain view. The suggested inference is truly extraordinary in my experience, as the reported cases in which law enforcement officers enter a residence and find drugs and paraphernalia strewn about are legion. See, e.g., Mona Lynch, Crack Pipes and Policing: A Case Study of Institutional Racism and Remedial Action in Cleveland, 33 Law & Pol’y 179, 195 (2011) (“[Mjany such cases come in when police enter a residence or hotel room and find the crack pipes, almost always in plain view.” (Citation and internal quotation marks omitted.)); see also I. Bennett Capers, Crime, Legitimacy, and *454 Testilying, 83 Ind. L.J. 835, 869 (2008) (“To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant or claim they saw the drugs in plain view after responding to the premises on a radio run.” (quoting Comm’n to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Dep’t, City of New York, Commission Report 36 (1994))); Samuel R. Gross & Katherine Y. Barnes, Road Work Racial Profiling and Drug Interdiction on the Highway, 101 Mich. L.Rev. 651, 673 (2002) (“Typical bases for probable cause to search on 1-95 include: drugs in plain view; the odor of burnt marijuana; and occasionally a ‘K-9 alert’ by a police dog trained to detect illegal drugs.”). In my view, only the speculation with the most doubtful support links the drugs’ presence in plain view to Thomas with any more force than to any other occupant of Norvell’s apartment. A more likely inference is the drugs remained in plain view because the three people seated at the kitchen table and Henderson were in the process of using them shortly before the officers arrived, and there was no perceived reason compatible with the intended near-term use to conceal them.
After completing the search, the officer asked Thomas and Henderson for identification. Henderson complied, but Thomas initially gave a false name and birthdate and indicated he could not remember his Social Security number. When a records check for the name came up blank, the officers confronted Thomas, who identified himself and explained he had behaved as he did because he believed there was an outstanding out-of-state warrant for his arrest. Henderson testified Thomas had expressed the same concern as the officers were entering the apartment and they had moved to the bedroom. The officers later determined Thomas had been mistaken and there was no outstanding warrant.[7]
The majority also asserts a cognizable inference connecting Thomas to the contraband arises from the fact that he closed the bedroom door, sought to hold it shut against the officers’ attempt to enter, and did not accurately identify himself when asked to do so. We have previously noted evidence of suspicious behavior or furtive movements by an accused may be an important factor in our determination of whether the State has presented substantial evidence of possession. See Cashen, 666 N.W.2d at 572 (noting lack of suspicious behavior); Atkinson, 620 N.W.2d at 5-6 (considering evidence of alleged furtive movements of a passenger in a motor vehicle). The State suggests Thomas’s flight to the bedroom upon the officers’ entering the apartment, his resistance at the bedroom door, and his relaying of a false name each support an inference of guilt.
We have long explained that for purposes of our analysis, we typically consider as a single circumstance “the fact of an accused’s flight, ... resistance to arrest, ... [and] assumption of a false name,” in determining what inferences are to be drawn from this kind of conduct. State v. Wimbush, 260 Iowa 1262, 1268, 150 N.W.2d 653, 656 (1967) (quoting 2 Wig-more on Evidence § 276, at 111 (3d ed.1940)). Moreover, we have often em *455 phasized the caution with which we must consider “suspicious” behavior or evidence of flight. See, e.g., State v. Bone, 429 N.W.2d 123, 126-27 (Iowa 1988) (noting any marshaling instruction on flight evidence “should include the caveat that there may be reasons for the flight (or concealment) which are fully consistent with innocence”); cf. Kentucky v. King, 563 U.S. -, -, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865, 881 (2011) (“[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.”); Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (explaining a police officer is free to approach a suspect without grounds for a stop, but the suspect’s choice to walk away and not listen to the officer “does not, without more, furnish those grounds”).
We have expressed this caution in part because the value of evidence of resistance or flight depends entirely on the degree of confidence with which we can draw a chain of very specific, and often improperly speculative, inferences from the evidence. See, e.g., United States v. Hankins, 931 F.2d 1256, 1261 (8th Cir.1991). That chain would have us conclude an accused’s behavior actually constitutes flight or resistance, conclude the flight or resistance clearly indicates the accused’s consciousness of some kind of guilt, conclude the consciousness of some kind of guilt clearly indicates the accused’s consciousness of guilt of the crime eventually charged, and conclude consciousness of guilt with respect to the crime eventually charged clearly indicates the accused’s actual guilt of that crime. See id.; see also Bone, 429 N.W.2d at 125 (explaining “departure from the area where a crime has allegedly taken place is of marginal probative value” and noting other unexplained circumstances must be taken in conjunction with the departure to reasonably justify an inference of guilt); cf. Webb, 648 N.W.2d at 81 (“When the fact or facts proposed to be established as a foundation from which indirect evidence may be drawn, by way of inference, have not a visible, plain, or necessary connection with the proposition eventually to be proved, such evidence is rejected for ‘remoteness.’ ” (quoting Black’s Law Dictionary 1295 (6th ed.1990))).
As a result of this very tenuous nature of flight and resistance evidence, we have often noted its presence in prosecutions for possession of illegal drugs, but we have remained reluctant to find a real inference from such evidence that the accused actually exercised possession of the illegal substance eventually found. See, e.g., Atkinson, 620 N.W.2d at 5-6. Instead, where an accused raises some plausible explanation for behavior the State invites us to find suspicious and suggestive of guilt of the crime charged, we have generally rejected the State’s proposed inference as too speculative in the absence of something more. See, e.g., id. (noting, where accused explained her “furtive” hand movements as the result of an attempt to move her nearby purse, any “conclusion that the defendant exercised control over [the contraband] by attempting to hide it would be based on pure speculation”).
Here, I cannot find the evidence of Thomas’s resistance substantial evidence of his possession of the cocaine and marijuana found in Norvell’s bedroom on Nor-vell’s purse. This conclusion is based in part on both Henderson’s explanation and Thomas’s own explanation for his behavior — namely, his mistaken but nonetheless real fear of the outstanding warrant for his arrest. Those explanations alone weaken my confidence in the chain of inferences the State urges from the resistance evi *456 dence, as they cast substantial doubt on the notion Thomas’s behavior was attributable to consciousness of guilt for possessing the drugs under the circumstances presented here.
The majority also places great emphasis on the fact the marijuana and cocaine were found by the officers near where Thomas stood while resisting the officers’ entrance into the room.[8] But, as I have already noted, this court’s decisions have consistently held mere proximity to contraband in a jointly occupied structure or vehicle will not suffice to support a conviction based on constructive possession. The compelling need to apply this principle here seems obvious because the bedroom was Norvell’s, the purse on which the drugs were found was Norvell’s, the officers had seen Henderson smoking marijuana just moments before he entered the bedroom, and all the other occupants of the apartment were seated around a table where the cocaine residue-laden spoon and empty plastic bags were found.
Our caselaw confronting similar scenarios affirmatively counsels against a conviction here, given the discovery of the paraphernalia near the other three occupants, and the discovery of the drugs among Nor-vell’s belongings, in Norvell’s bedroom. See Webb, 648 N.W.2d at 79, 81 (overturning possession conviction and noting none of the prohibited “items [were] found near or among Webb’s personal belongings”); McDowell, 622 N.W.2d at 308 (“There is no evidence that defendant had ever accessed the purse belonging to Scott in which the firearm was contained.”). The inference to be drawn from the totality of this evidence points away from Thomas, suggesting it was more likely the marijuana and cocaine belonged to someone else present in the apartment, and accordingly, suggesting it was more likely some other occupant possessed it for purposes of our analysis.
The cases cited by the majority, by contrast, examine starkly different scenarios, where the evidence supporting guilt has been far less speculative than the evidence we consider here. In DeWitt, for example, officers corroborated information from a confidential informant who had previously specifically identified DeWitt, his intent to sell the drugs eventually discovered, and the vehicle in which he would be traveling with the drugs. State v. DeWitt, 811 N.W.2d 460, 465 (Iowa 2012). Although other individuals had “occasional[ ]” access to the vehicle where the drugs were found, DeWitt was the sole occupant at the time of discovery, and we noted DeWitt “was the most recent driver” and “a frequent driver of the car: he drove it six days a week for work.” Id. at 475-76. Notably, for purposes of our analysis here, the scenario in DeWitt involved no other individual who might have been suspected of controlling the drugs. On those facts, the DeWitt scenario presented far less risk of inappropriate speculation than the facts we consider here.
The circumstances in State v. Carter, 696 N.W.2d 31 (Iowa 2005), are likewise distinguishable. There, officers, in attempting to stop a vehicle for a license plate infraction, observed the vehicle “cross[ ] three lanes of traffic, [strike] the curb, and just miss[ ] a light pole.” Carter, 696 N.W.2d at 34. While that was happening, officers observed the driver “making movements with his right hand all the way down to the floorboard, causing his head to go down so he could not see the road.” Id. On further investigation, *457 the officer discovered drugs “in the same area toward which the driver of the Blazer was moving his hand just prior to the stop.” Id. at 35. On those facts, we concluded, “the district court could reasonably infer that Carter was exhibiting a proprietary interest in the controlled substances by desperately trying to hide them while the police were pursuing him, resulting in his losing control of the Blazer.” Id. at 41. And, we added, “Carter’s furtive movements in contrast to the passenger’s lack of such movements would further support such an inference.” Id. Here, we had no evidence of Thomas’s movement toward the purses, we had evidence affirmatively delinking Thomas from the drugs in the form of Henderson’s testimony, and we had evidence of flight from both Henderson and Thomas. Carter therefore bears little, if any, resemblance to our facts for purposes of concerns about specu-lativeness, despite the majority’s strained attempt to conclude otherwise.[9]
The majority also notes Thomas had $120 cash on his person, while the others present in Norvell’s apartment had none. We have previously acknowledged in our caselaw that some substantial sum of money found on an accused in conjunction with discovery of drug paraphernalia in the accused’s residence may, in certain instances, support a finding of possession. See State v. Randle, 555 N.W.2d 666, 668, 672 (Iowa 1996) (examining a scenario where police found $395 on an accused). We have also explained, however, that even where an illegal substance is found in an accused’s residence, in the absence of more substantial evidence like fingerprints on the recovered substance, immediate and exclusive access to the substance, or discovery among the personal belongings of the accused, evidence of discovery of a similar sum of money on an accused is “too tenuous and speculative to support an inference of constructive possession.” Webb, 648 N.W.2d at 80 (examining scenario where accused was found with $336 on his person). Regardless the nature of the circumstances, however, I conclude $120 falls far short of the threshold value on which a reasonable fact finder may rely as circumstantial evidence tending to prove possession of drugs. Common sense dictates this amount fails to reliably indicate dealing in controlled substances. See, e.g., State v. Brown, 310 N.C. 563, 313 S.E.2d 585, 589 (1984) (noting “over $1,700 in cash” was a figure worth considering in its possession analysis).
More importantly, in both Webb and Randle, we noted the importance of the discoveries of contraband in the residences of the accused — a circumstance conspicuously absent here. See Webb, 648 N.W.2d at 81; Randle, 555 N.W.2d at 672. The value of the money recovered from Thomas was equally consistent with any number of eventualities, including a weekly trip to the ATM, the purchase of a few tickets to a baseball game, or a trip to the grocery *458 store. As we have often explained, and as I think it important to emphasize in this case with respect to both the money found in Thomas’s possession and the totality of the circumstances, “when two reasonable inferences can be drawn from a piece of evidence,” such evidence can give rise only “to a suspicion, and, without additional evidence, is insufficient to support guilt.” State v. Truesdell, 679 N.W.2d 611, 618-19 (Iowa 2004).
In cases like this where reasonable inferences other than the ones the State urges may be drawn, I would conclude the evidence cannot support a finding of guilt. See id.; Cashen, 666 N.W.2d at 572-73; cf. George H. Singer, Constructive Possession of Controlled Substances: A North Dakota Look at A Nationwide Problem, 68 N.D. L.Rev. 981, 1008 (1992) (noting joint occupancy cases require “the most exacting scrutiny” and “possession cannot be established by virtue of the fact that the defendant has been in the company of one who has a narcotic on his or her person or is present in an area where narcotics are found,” and explaining “[independent evidence that links each defendant to the contraband must be presented”).
Taking all the evidence together, then, I conclude Thomas’s brief proximity to where the drugs were eventually discovered and his strong reluctance to interact with the police cannot constitute substantial evidence of his possession of the marijuana and cocaine. Numerous other equally plausible explanations of the sequence of events linking the marijuana and cocaine to others abound here, and I thus cannot find the State’s evidence was “wholly inconsistent with any rational” explanation of Thomas’s innocence. See Reeves, 209 N.W.2d at 21 (quoting Schurman, 205 N.W.2d at 734). Accordingly, I conclude the district court erred in failing to grant Thomas’s motion for directed verdict on the possession charges and I would therefore affirm the well-reasoned opinion of the court of appeals.
I also think it prudent to note that as of mid-year 2013, there were approximately 1860 individuals incarcerated in Iowa prisons for drug offenses as their most serious offense. See Div. of Criminal & Juvenile Justice Planning, Iowa Dep’t of Human Rights, Iowa Prison Population Forecast FY2013-2023, at 26 (2013) [hereinafter 2023 Forecast ] (“[T]he percent of inmates serving sentences for drug crimes (as their most serious offense) has increased from two percent in 1988 ... to 23 percent in 2001, remaining at 23 percent in 2013.... ”); id. at 12 (“Drug admissions have been one of the driving forces behind rising prison populations in Iowa for more than the past decade, reaching their peak in FY2004, when 32 percent of the new inmates entering prison were committed for drug offenses. More broadly, between FY2004 and FY2013, nearly 27 percent of Iowa’s prison population has entered prison after conviction for drug crimes.”). The doctrine of constructive possession is a court-made construct. This court has historically limited the doctrine’s application in drug cases by upholding convictions only when the State has linked a defendant to illegal substances through proof that establishes his dominion and control and thereby excluded other persons jointly occupying a space who might also be suspected of having some connection with the contraband as a consequence of their presence. Put another way, we have acted as careful gatekeepers of a court-made doctrine and by doing so have avoided exacerbating the overcrowding of our prisons with drug offenders. See 2023 Forecast, at 3 (“By June 30, 2014, Iowa’s prison population is expected to exceed official capacity by about 750 inmates, or by about 10 percent, if current offender behaviors and justice system trends, policies, and prac *459 tices continue....”); Div. of Criminal & Juvenile Justice Planning, Iowa Dep’t of Human Rights, Public Safety Advisory Board Report to the Iowa General Assembly 3 (2018) [hereinafter PSAB Report] (“Eliminating mandatory sentences for low/low moderate risk [drug] offenders would result in cost savings without changing return-to-prison rates.”). Moreover, our careful application of our possession jurisprudence in the past has been consistent with our distaste for systems of selective prosecution and our respect for the autonomy rights of individuals engaging in legal social behavior. See Michael S. Deal, United States v. Walker: Constructive Possession of Controlled Substances: Pushing the Limits of Exclusive Control, 2 J. Pharmacy & L., 401, 405 (1994) (noting in the absence of a standard like the one advocated by Whitebread and Stevens, “numerous problems arise in conjunction with use of the constructive possession doctrine; including, the difficulty courts have in assessing liability in possession cases, liability for presence at a place where drugs are being used and the creation of a system of selective law enforcement”); see also 2023 Forecast, at 13 (“Another factor pertaining to drug commitments that bears continued inspection is the relationship between Iowa’s historically high rate of African-American imprisonment and drug commitments.”); PSAB Report, at x (“The over-representation of African-Americans in the prison population has been an ongoing issue for Iowa.”). I dissent here because I believe the court’s decision today is inconsistent with these values and takes us in a markedly different direction.
WIGGINS and APPEL, JJ., join this dissent.

. I note the State advanced its case at trial only in terms of "constructive possession,” because, as the prosecutor explained there, where individuals “have the ability to try and flee and throw that substance ... so that it cannot be taken directly off their person ... this fact pattern is the norm and in most instances the officers deal with constructive possession.” On appeal, the State contends more generally the jury was free to find the real reason for Thomas's elusive behavior was his actual possession of the drugs on his person when the police arrived and when he entered the bedroom.

. I note the articulation of possession principles in our recent decision in State v. Vance, 790 N.W.2d 775, 784-85 (2010), is consistent with the principle I describe here, and consistent with the purposes underlying the standards for proving possession we have set forth in our prior decisions addressing these standards. In Vance, we explained "actual possession” may be shown by direct or circumstantial evidence, and concluded the defendant's actual possession of a pharmacy receipt for pseudoephedrine and additional circumstantial evidence were sufficient to support a finding that at one time the defendant had actually exercised possession of the pseudoephedrine. See Vance, 790 N.W.2d at *450 784. Vance departed from the very clear trend in our caselaw and the decisions of other courts in applying the label of "actual possession” to a case where the State presented evidence an accused may have exercised possession of a substance at some point in the past. See, e.g., State v. Carter, 696 N.W.2d 31, 39-40 (Iowa 2005) (engaging in constructive possession analysis in case where substance was found in the same place where driver had been moving his hand prior to stop, because substance "was not found on his person”); Cashen, 666 N.W.2d at 568-69 (noting, where marijuana was found wedged in car seat where accused had been sitting, "the possession to be found, if any, must be constructive” because "the officers did not find the marijuana on [defendant's] person”); see also People v. Gallagher, 12 Cal.App.2d 434, 55 P.2d 889, 890 (1936) (articulating constructive possession doctrine and applying it where defendant directed officers to his lodging house and explained morphine could be found in his mattress); Kern, 831 N.W.2d at 161 ("Because no marijuana was found on Kern’s person, she was not in actual possession of the marijuana.”); State v. DeWitt, 811 N.W.2d 460, 474 (Iowa 2012); Whitebread & Stevens, 58 Va. L.Rev. at 755 (explaining doctrine of constructive possession originated to address those cases where actual possession at the time of arrest cannot be shown, but where the inference the defendant had possession at one time is very strong). Our examination of the evidence in Vance, however, and our resulting conclusion the State’s evidence was sufficient to establish the accused had at one time exercised possession of the substance functioned to satisfy the same standard we have always set forth for determining whether the State has established the statutory possession requirement. In other words, in Vance, as in every possession case, we were confronted with and answered the question of whether the State had presented sufficient evidence to establish, beyond a reasonable doubt, that an accused had actually exercised possession of the substance in question. See Vance, 790 N.W.2d at 784 (concluding evidence could establish accused possessed pseudoephedrine based on evidence he purchased the pills from CVS, evidence of his exclusive occupancy of vehicle in which pseu-doephedrine, coffee grinder, and recently manufactured methamphetamine were found, his incriminating statements, and the paraphernalia found in his pockets); cf. Michael S. Deal, United States v. Walker: Constructive Possession of Controlled Substances: Pushing the Limits of Exclusive Control, 2 J. Pharmacy & L. 401, 405 n. 43 (1994) (explaining, for purposes of establishing possession, "[t]here must either be a requirement that exclusive control over the area where the contraband is found must exist, or substantial evidence that defendant possessed the drug on his person at some time in the past must exist” (citing Whitebread & Stevens, 58 Va. L.Rev. at 766-74)). Undeterred by our longstanding evidentiary threshold in drug possession cases, the majority, without significant discussion on this point, dismisses out of hand every other applicable case in our history of possession jurisprudence and applies the “Vance formulation” in a manner lowering the bar for conviction.

. In the subsequent search of the apartment, the officers located a phone and prescription medication belonging to Henderson on a dresser in the bedroom. The record further suggests Henderson had placed those items there at some time before the officers arrived. Thus one could at least speculate that Henderson — whom the officers had seen *453 smoking marijuana — placed the marijuana and cocaine on Norvell’s purse when he was ■ in the bedroom earlier depositing his phone and medication on the dresser. One could further speculate that the marijuana the officers had seen Henderson smoking just minutes earlier had been just part of his stash, while the remainder of it was located in Nor-vell’s bedroom.

. I also note the officers testified that when questioned shortly after the discovery of the drugs, Henderson indicated he knew nothing about their origin and gave no indication he had seen Thomas discard them.

. The officers’ testimony revealed two propositions about the potential significance of Thomas's explanation of his behavior as a result of his mistaken belief in an outstanding arrest warrant: (1) individuals will often give fake names or engage in misdirection, as Thomas did here, because they have outstanding warrants, and (2) individuals sometimes express fabricated beliefs in outstanding warrants as efforts to misdirect officers’ attention from the trouble at hand.

. Henderson’s testimony indicated Thomas was not by the wall behind the door when the officers actually entered the bedroom, but instead had retreated away from the door toward the bed as the officer forced the door open.

. The majority labors even more strenuously in attempting to rely on Maxwell and Nitcher. In Nitcher, we had evidence of the defendant’s occupancy of the premises where drugs were discovered, his fingerprint on paraphernalia involved in the drug manufacturing process and laden with precursor residue, the scent of precursor emanating from his clothing, and additional paraphernalia used in the manufacturing process located in close proximity to his clothing in his bedroom. See State v. Nitcher, 720 N.W.2d 547, 558 (Iowa 2006). In Maxwell, we had evidence the defendant was the sole recent occupant of the vehicle in which the drugs were found, the drugs were found in a box of cigarettes wedged between the front seats in reach of the defendant as he was driving, and the defendant was found with a box of the same brand of cigarettes on his person, in addition to the evidence of his furtive behavior. Maxwell, 743 N.W.2d at 194. Neither case raises anything like the spectre of speculation we confront here.