WATERMAN, Justice
(dissenting).
I respectfully dissent and would affirm the district court ruling denying Coleman’s motion to suppress, as did the court' of appeals. Until today, a police officer who lawfully stopped a motorist could ask to see his or her driver’s license, especially when the officer knew, the driver was not the car’s registered owner. Almost all low- *302 ans, I believe, would find this activity completely unobjectionable and, indeed, mundane. But not the majority. Instead, our court has determined that this act of routine traffic enforcement violates the search and seizure provision of the Iowa Constitution. The United States Supreme Court reached the opposite conclusion under the Fourth Amendment in 2015. See Rodriguez v. United States, 575 U.S. -, -, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492, 499 (2015).
To get to its result, the majority overrules another one of our established search and seizure precedents. In State v. Jackson, we correctly decided a quarter century ago that the constitution does not require an officer who lawfully stops a vehicle to “treat the [driver] as if he had never seen him.” 315 N.W.2d 766, 767 (Iowa 1982). Rather, after dispelling the original purpose for the stop, the officer could perform the minimally intrusive step of checking the driver’s license, which Iowa drivers are required by statute to carry and display upon an officer’s- request. Id.; see also Iowa Code § 321.174(3) (2013) (“A licensee shall have the licensee’s driver’s license in immediate possession at all times when operating a motor vehicle and shall display the same upon demand of a ... peace officer.... ”). I would affirm Mr. Coleman’s conviction for driving while barred by following our eom-monsense decision in Jackson and United States Supreme Court precedent explicitly allowing officers to check the driver’s license, vehicle registration, and proof of insurance as part of the routine mission of any traffic stop. Rodriguez, 575 U.S. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499.
We recently followed Rodriguez in In re Property Seized from Pardee, 872 N.W.2d 384, 391-93 (Iowa 2015), and have no good reason to depart from it here. Indeed, the Illinois Supreme Court within this past year unanimously applied Rodriguez to uphold a license check under the same facts presented. People v. Cummings, 399 Ill. Dec. 210, 46 N.E.3d 248, 252 (Ill. 2016).
Iowans who get pulled over expect to show their driver’s license to the officer. This practice helps law enforcement get dangerous, illegal drivers off the road. The majority fails to mention why Coleman had been barred from driving. His criminal record includes four prior convictions for driving while barred, two prior convictions for driving while suspended, several narcotics convictions, and notably, a conviction for second-offense operating while intoxicated (OWI) committed two days before Officer Morris pulled him over. The majority gives Coleman a free pass.
The majority goes out of its way to connect this case, at least implicitly, to racial profiling. This is hardly the case to impugn motives of Iowa law enforcement. It is undisputed Officer Morris could not see the driver that night and did not know the driver’s gender or race. He stopped the vehicle because its registered owner (a woman) had a suspended driver’s license, and he reasonably assumed she was driving her own car. There is no evidence or claim by Coleman that Officer Morris pulled him over due to his race. See Kothe v. State, 152 S.W.3d 54, 64 (Tex. Crim. App. 2004) (“This is not an instance of an indefatigable Inspector Javert mercilessly pursuing, harassing, and hounding his quarry through Paris sewers or Kendall County highways by concocting excuses to detain him.”). To the contrary, Coleman’s counsel expressly rejected this possibility in response to a question from a member of this court at oral argument. Officer Morris was entitled to ask for Coleman’s driver’s license and to detain him upon discovering he was driving while barred. After today, habitual offenders stopped un *303 der similar circumstances will be able to simply drive away without an identity check.
The majority flouts our error preservation rules to make another end run around precedent by deciding this case under a sua sponte interpretation of article I, section 8 of the Iowa Constitution.[3] Coleman never raised the Iowa Constitution in district court and never argued on appeal that it provided more restrictions on police than the Fourth Amendment. I would hold Coleman waived any claim for greater protection under the Iowa Constitution. I will now further develop the reasons for my dissent, beginning with the threshold issue of waiver.
A. Error Preservation—the Iowa Constitution. Coleman’s motion to suppress filed in district court did not mention the Fourth Amendment or Iowa Constitution,[4] nor did he cite to either constitution during the hearing on that motion. Just last term, in State v. Prusha, we unanimously held the defendant failed to preserve a state constitutional search and seizure claim when he mentioned only the Fourth Amendment in district court. 874 N.W.2d 627, 680 (Iowa 2016). Now, the majority finds error was preserved when trial counsel failed to mention either the Fourth Amendment or the Iowa Constitution.
So less has become more. See State v. Short, 861 N.W.2d 474, 626 (Iowa 2014) (Mansfield, J., dissenting) (“[I]t almost seems as if a lawyer in this court would be wiser not to develop an Iowa constitutional argument.”). Constitutional jurisprudence should not be a race to the bottom. Notwithstanding the State’s incorrect statement that error was preserved, Coleman waived his belated claim for broader restrictions on police under article I, section 8 of the Iowa Constitution.[5]
*304 By surprising the State with a new interpretation of our state constitution, the majority rewards trial counsel’s silence and gives all defense counsel a perverse incentive to lay in the weeds in district court. This approach deprives the State of the opportunity to address the state constitutional claim at the trial level, perhaps by making a different evidentiary record., . It also deprives the district court of the op-, portunity to rule on the state constitutional claim.
“Error preservation is important for .two reasons: (1) affording the district court an ‘opportunity to avoid or correct error’;, and (2) providing the appellate court ‘with an adequate record in reviewing errors p.ur-portedly committed’ by the district court.” State v. Ambrose, 861 N.W.2d 550, 555 (Iowa 2015) (quoting State v. Pickett, 671 N.W.2d 866, 869 (Iowa 2003)). We do not consider issues for the first time on appeal. See Geisler v. City Council, 769 N.W.2d 162, 166 (Iowa 2009). Because Coleman did not raise a claim under the Iowa Constitution in district court, I would find he did not preserve it. See id.
“Our obligation on appeal is to decide the case within the framework of the issues raised by the parties.” Feld v. Borkowski, 790 N.W.2d 72, 78 (Iowa 2010). We should “do no more and no less.” Id. The majority in this case unnecessarily overturns existing law sua sponte. In so doing, the majority violates the admonition so recently reiterated in Feld:
[I]n the absence of the most cogent circumstances, we do not create- issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change. In this case, we are restrained to apply the controlling law as advocated by the parties, and we do not consider or forecast whether or ,not that controlling law should be abandoned or changed....
Id, at 78 n.4 (citations omitted). The restraint exercised by our court in Feld should have been employed here.
Error preservation rules apply to the State and defendant alike. DeVoss v. State, 648 N.W.2d 56, 63 (Iowa 2002) (“Because error preservation is based on fairness, we think both parties should be bound by the rule.”).[6] We should not reverse the district court for failing to credit an argument a party never made at trial. See id. (“Ordinarily, we attempt to protect the district court from being ambushed by parties raising issues on appeal that were not raised in the district court.”). Judges cannot assume the role of a partisan advocate and do counsel’s work. See Hyler v. Garner, 548 N.W.2d 864, 876 (Iowa 1996) (“[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments.”); see also State v. Hicks, 791 N.W.2d 89, 97-98 (Iowa 2010) (declining to speculate as to argument not made at district court); Feld, 790 N.W.2d at 83 (Appel, J., concurring in part and dissenting in *305 part) (“Judges are not advocates who reach out to decide questions the parties themselves either deem unimportant or, for whatever reasons, fail to raise. The job of the court is to decide concrete cases the parties bring to it.”); In re S.P., 719 N.W.2d 535, 539-40 (Iowa 2006) (stating “the court is prohibited from assuming the role of an advocate” and calling for “what Edmund Burke described as the ‘cold neutrality of an impartial judge’” (quoting State v. Glanton, 231 N.W.2d 31, 35 (Iowa 1975))); State v. Biddle, 652 N.W.2d 191, 198 (Iowa 2002) (noting the “constitutional right to have a neutral and detached judge”); Inghram v. Dairyland Mut. Ins. Co., 215 N.W.2d 239, 240 (Iowa 1974) (noting that we do not “assume a partisan role and undertake [a party’s] research and advocacy”).
When Coleman belatedly raised the Iowa Constitution on appeal, he never argued for a different standard than we apply under the'Fourth Amendment. Therefore, our court should have applied the federal framework. See, e.g., Reilly v. Iowa Dist. Ct., 783 N.W.2d 490, 494 (Iowa 2010) (“Because Reilly has not advanced á standard for interpreting the due process clause under the Iowa Constitution different from its federal constitutional counterpart, we will apply the general principles as outlined by the United States Supreme Court.”); State v. Bruegger, 773 N.W.2d 862, 883 (Iowa 2009) (applying Federal Eighth Amendment framework because defendant “has not advanced a standard for interpreting the cruel and unusual punishment provision under the Iowa Constitution differently”); In re Det. of Garren, 620 N.W.2d 275, 280 n.1 (Iowa 2000) (refusing to deviate from federal analysis in considering state constitutional claim because appellant “ha[d] suggested no legal deficiency in the federal principles ... nor ha[d] he offered an alternative test or guidelines”).
“The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.” Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983). We should not break from precedent and plow new ground without affording all parties the opportunity to address the issue in district court and on appeal. The risk of unintended consequences escalates when our court freelances. Constitutional errors cannot be fixed legislatively.
B. The Search and Seizure Analysis. To me, this is an easy case. As Judge McDonald observed in his special concurrence in this case, “Jackson is rooted in long-standing Fourth Amendment principles [that were] reaffirmed in Rodriguez and Pardee.” It is undisputed that Officer Morris lawfully stopped Coleman. Officer Morris could not identify who was driving the moving vehicle at night and its registered owner had a suspended license. In State v. Vance, we determined
an officer has reasonable suspicion to initiate an investigatory stop of a vehicle to investigate whether the driver has a valid driver’s license when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle.
790 N.W.2d 775, 781 (Iowa 2010). Even when an officer is mistaken about a driver’s identity, “[o]ur precedent is clear that a mistake of fact may justify a traffic stop.” Tyler, 830 N.W.2d at 294. Having lawfully stopped Coleman, Officer Morris crossed no constitutional line by simply asking to see Coleman’s driver’s license.
The majority gives short shrift to the dispositive caselaw and reaches the wrong *306 result through a meandering discussion of dissenting opinions and out-of-date precedent.[7] In Rodriguez, the Supreme Court, in a majority opinion authored by Justice Ginsburg, delineated the bounds of a traffic stop based on reasonable suspicion: 575 U.S. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 499. An officer stopped Dennys Rodriguez for driving on a highway shoulder, a violation of Nebraska law. Id. at -, 135 S.Ct. at 1613, 191 L.Ed.2d at 496. After attending to everything related to the stop, including checking the driver’s license and issuing a warning citation, the officer detained Rodriguez for another seven to eight minutes to walk a drug-detection dog around the vehicle. Id. at -, 135 S.Ct. at 1612, 191 L.Ed.2d at 497. The Court held this seven- to eight-minute delay violated the Fourth Amendment if it was not supported by independent reasonable suspicion and remanded the case for determination of that issue. Id. at -, 135 S.Ct. at 1616-17, 191 L.Ed.2d at 500-01. “Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure’s ‘mission’—to address the traffic violation that warranted the stop and attend to related safety concerns.” Id. at -, 135 S.Ct. at 1614, 191 L.Ed.2d at 498 (citation omitted). The Court concluded the officer’s mission ended after the time reasonably required to issue the warning citation. Id. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500. The officer could not prolong the stop by detaining the driver to wait for the drug dog without independent reasonable suspicion. Id.
In so holding, the Court made clear that “[bjeyond determining whether to issue a traffic ticket, an officer’s mission includes ‘ordinary inquiries incident to [the traffic] stop.’ ” Id. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499 (alteration in original) (quoting Illinois v. Caballes, 543 U.S. 405, 408, 125 S.Ct. 834, 837, 160 L.Ed.2d 842, 847 (2005)). “Typically such inquiries involve checking the driver’s license, determining whether there are outstanding warrants against' the driver, and inspecting the automobile’s registration and proof of insurance.” Id. The Court stated these actions serve the same “objective” as the traffic code: “ensuring that vehicles on the road are operated safely and responsibly.” Id. Rather than an interest' in criminal enforcement, the Court noted, these actions “stem[ ] from the mission of the stop itself.” Id. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500.
The Court contrasted these “negligibly burdensome precautions” with running a drug dog around the vehicle, which “is a measure aimed at ‘detecting] evidence of ordinary criminal wrongdoing.’ ” Id. at -, 135 S.Ct. at 1615-16, 191 L.Ed.2d at 499-500 (alteration in original) (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 41, 121 S.Ct. 447, 454, 148 L.Ed.2d 333, 343 (2000)). “Lacking the same close connection to roadway safety as the ordinary inquiries,” the Court held unrelated inquiries to search for other criminal wrongdoing could not prolong the duration of the stop without reasonable suspicion. Id. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499.
Justices Thomas, Kennedy, and Alito dissented on the validity of the drug search, but all nine justices agreed the officer may obtain license and registration information as an ordinary incident of any lawful stop. See id. at -, 135 S.Ct. at *307 1624, 191 L.Ed.2d at 609 (Alito, J., dissenting) (noting the majority’s conclusion that asking for driver’s license and completing a records check on driver was “properly part of the traffic stop”). I would follow this unanimous contemporary decision of our nation’s highest court.
We applied Rodriguez in Pardee, 872 N.W.2d at 391-93. A highway patrolman on a drug interdiction mission began trailing a car with California license plates and stopped the driver, John Saccento, for a broken taillight and following a semitrailer too closely. Id. at 386. Robert Pardee was a passenger in the car. Id. at 387. After twenty-five minutes, the trooper told the occupants they were free to go, but when they lingered, the officer resumed his questioning. Id. at 388. The officer, based on responses he found suspicious, detained Pardee and the driver to run a drug dog around the vehicle. Id. We concluded the officer had unlawfully prolonged the duration of the stop without particularized suspicion of wrongdoing and reversed the district court’s denial of Pardee’s motion to suppress. Id. at 397. But we emphasized
[a] dog sniff, unlike matters such as “checking the driver’s license, determining whether there are outstanding warrants against the driver, and inspecting the automobile’s registration and proof of insurance,” can only be undertaken without individualized suspicion if it does not prolong the traffic stop.
Id. at 393 (emphasis added) (quoting Rodriguez, 575 U.S. at -, 135 S.Ct. at 1615, 191 L.Ed.2d at 499).[8] Thus, both Rodriguez and Pardee recognized that a license check is within the original mission of the traffic stop. These checks do not require separate, articulable, individualized suspicion because they fall within the scope of the stop.
Well before Rodriguez and Pardee, our precedent allowed an officer to check a driver’s license once the driver had been stopped lawfully. In Jackson, a deputy sheriff pulled over a car driven by Louis Jackson because it had no license plate. 315 N.W.2d at 767. “Upon being alerted to the reasons for the stop, defendant directed the officer’s attention to a properly displayed department of transportation paper plate.” Id. At that point, reasonable suspicion for the stop dissipated. Id. But Jackson was unable to produce a driver’s license and admitted his license had been suspended. Id. He was charged with driving under suspension. Id. Jackson filed a motion to suppress, stating,
The request of the Defendant to see his license constituted a search and was vio-lative of the court, the Fourteen[th] Amendment ] of the United States Constitution and the Constitution of the State of Iowa as being conducted without probabl[e] cause.”
Def.’s Mot. to Suppress in Jackson, at 2. The district court granted the motion to suppress. Jackson, 315 N.W.2d at 767. We reversed the district court. Id. We held the officer was authorized to ask for the driver’s license:
The stop of defendant’s vehicle was not a random or selective stop. His vehicle did not have license plates displayed. This failure would ordinarily be a violation of section 321.37, [t]he Code. When the department of transportation paper plates were pointed out to the officer there arose no requirement that he treat the defendant as if he had never seen him. Section 321.174, [t]he Code, requires all persons operating a motor ve- *308 hiele upon a highway in the state to have immediate possession of a valid operator’s license, and to display the same upon the demand of a peace officer. Notwithstanding the fact that a mistake concerning the license plates led to the defendant’s stop there was nothing illegal about the fact that, once he was stopped and exonerated, he was asked to display his operator’s license.
Id. I would follow Jackson.
The majority inaccurately suggests Jackson was undermined by Florida v. Royer, a 1983 decision correctly stating that investigatory stops should “last no longer than is necessary to effectuate the purpose of the stop.” 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983). The majority overlooks two subsequent Iowa decisions that belie its conclusion. First, in 2004, we upheld the arrest of a passenger on an outstanding warrant, unanimously holding that the officer did not violate the passenger’s Fourth Amendment rights by checking his identification after the conclusion of a traffic stop. State v. Smith, 683 N.W.2d 542, 547-48 (Iowa 2004) (“The entire episode lasted but a minute; it was no moire intrusive to check Smith’s identification than to ask him a few question^.”). Here, Coleman voluntarily produced his identification to Officer Morris and makes no claim that encounter took over a minute.
Second, in 2005, we expressly reaffirmed Jackson in State v. Lloyd, when the officer initiated a traffic stop on a mistaken belief that a vehicle had no license plate but a temporary plate actually was in the rear window. 701 N.W.2d 678, 680 (Iowa 2005) (per curiam). The driver was charged and convicted of OWI, with a blood alcohol level over twice the legal limit. Id. at 679. We held the stop was valid and “there was nothing illegal about the fact that ... [Lloyd] was asked to display his operator’s license.” Id. at 681 (quoting Jackson, 315 N.W.2d at 767). We cited with approval post -Royer Eighth Circuit precedent that allowed the officer to check the driver’s identification after stopping the vehicle on the mistaken belief it failed to display a required license plate. Id. (citing United States v. Smart, 393 F.3d 767, 769 (8th Cir. 2005) (affirming conviction for felony possession of firearm discovered. after check of identification showed driver was under suspension and a suspect in a recent shooting)). Under the majority’s new regime, after noticing the validly displayed plate, the officer could only wave on the driver, permitting someone like Lloyd to drive away drunk, and Smart, the shooting suspect and felon, to depart the scene armed.
It has long been settled in Iowa, well after Royer, that when an officer lawfully stops a vehicle based on a reasonable mistake of fact, the officer, after resolving that reason for the stop, could proceed to check the driver’s license.[9] See id. Other jurisdictions, like Iowa, have recognized that the Fourth Amendment does not prohibit asking a driver for identification after the reasonable suspicion that prompted the stop has dissipated.[10]
*309 The majority relies on contrary state appellate decisions decided before Rodriguez. Those now outdated decisions concluded if an officer initiated a traffic stop based on reasonable suspicion from a mistaken observation, the officer could only inform the driver of the mistake and allow him or her to drive away. See, e.g., State v. Morris, 259 P.3d 116, 124 (Utah 2011). Such decisions are unpersuasive after Rodriguez.
Decisions applying Rodriguez consistently hold that an officer may request identification from a driver lawfully stopped even if reasonable suspicion for the stop has dissipated.[11] See United States v. Reidy, No. CR 13-71-BLG-DWM, 2016 WL 6208398, at *3 & n.3 (D. Mont. Oct. 24, 2016) (ruling that deputy who pulled over driver on suspicion that license plate was inadequately illuminated could check driver’s license first); State v. Allen, 779 S.E.2d 248, 251, 254-55 (Ga. 2015) (holding that Rodriguez permitted officer to check identification of a passenger as “part of the authorized mission of the traffic stop”); Cummings, 46 N.E.3d at 252; State v. Cotter, No. 2015AP1916-CR, 2016 WL 4468406 (Wis. Ct. App. Aug. 25, 2016) (per curiam) (“Consistent with Rodriguez, as well as with Wisconsin precedent ..., [the officer], after determining that he could, not issue a ticket on the basis for which the stop was initiated, was permitted to continue the stop for purposes of completing routine, matters such as gathering Craig Tomlinson’s license information. ...”).
The Illinois Supreme Court twice addressed the issue, before and after Rodriguez, in a factually analogous case, People v. Cummings, 379 Ill.Dec. 397, 6 N.E.3d 725, 727 (Ill. 2014) (Cummings I), cert. granted, judgment vacated sub nom. Illinois v. Cummings, — U.S. -, 135 S.Ct. 1892, 191 L.Ed.2d 760 (2015) (mem.), decision after remand, 399 Ill.Dec. 210, 46 N.E.3d 248 (Ill. 2016) (Cummings II). Derrick Cummings was driving a van owned by a woman named Pearlene Chattic. Cummings I, 6 N.E.3d at 727. A police officer initiated a traffic stop because Chattic had a warrant for her arrest. Id. The officer knew Chattic was a woman. Id. at 728. After stopping the vehicle; the officer saw the .driver was a male. Id. The officer nevertheless asked for his license and registration. Id. Cummings had no license and was arrested. Id. The trial court granted Cummings’s motion to suppress, and the Illinois Supreme Court initially affirmed, holding that reasonable suspicion “disappeared when [the officer] *310 saw that the defendant was not a woman and, therefore, could not be Chattic.” Id. at 731. The court concluded that requesting Cumming’s license “impermissibly prolonged the stop.” Id. at 731, 734. Two justices dissented, stating,
The majority’s rule, while narrow in this case, casts a wider shadow—that officers need an independent basis for requesting a driver’s license in a lawful traffic stop. This result protects a driver from an objectively and subjectively minimal intrusion, at the expense of complicating law enforcement in a situation “especially fraught with danger to police officers.”
Id. at 738 (Garmin, C.J., dissenting) (quoting Michigan v. Long, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201, 1218 (1983)).
The United States Supreme Court granted certiorari and vacated the judgment, remanding to the Illinois Supreme Court “for further consideration in light of Rodriguez v. United States.” Illinois v. Cummings, — U.S. at -, 135 S.Ct. at 1892, 191 L.Ed.2d at 760. On remand, the Illinois Supreme Court upheld the officer’s actions. Cummings II, 46 N.E.3d at 251. The Illinois Supreme Court observed that Rodriguez established
[t]he seizure’s mission consists of the purpose of the stop—in Rodriguez, traffic enforcement—and “related safety concerns.” Those related safety concerns include “ordinary inquiries incident to [the traffic] stop,” and typically “involve checking the driver’s license.... ”
Id. (quoting Rodriguez, 575 U.S. at -, 135 S.Ct. at 1614-15, 191 L.Ed.2d at 498-99). The Wisconsin Court of Appeals reached the same conclusion applying Rodriguez under nearly identical facts. Cotter, 2016 WL 4468406, at *5. I find the Cummings II court’s analysis of Rodriguez persuasive.
“Ordinary inquiries within the traffic stop’s mission clearly do not offend the fourth amendment.” Cummings II, 46 N.E.3d at 251. In rejecting the defendant’s argument that a license check must relate to the initial purpose of the stop, the Illinois Supreme Court reasoned,
Rodriguez makes clear that unrelated inquiries impermissibly prolong the stop beyond its original mission when those inquiries are not precipitated by reasonable suspicion. Ordinary inquiries incident to the stop do not prolong the stop beyond its original mission, because those inquiries are a part of that mission. Indeed, defendant’s view would collapse the two parts of the mission— the initial purpose of the stop and ordinary inquiries of the stop—into just the purpose of the stop. Nothing in Rodriguez suggests that license requests might be withdrawn from the list of ordinary inquiries for a nontraffic enforcement stop.
Id. at 252 (emphasis added) (citations omitted). Reasonable suspicion may dissipate when the officer fulfills one part of the mission of the stop—to address the perceived traffic violation. However, the officer can still proceed to fulfill the other part of the mission by attending to related safety concerns, such as checking the driver’s license. See Rodriguez, 575 U.S. at -, 135 S.Ct. at 1614, 191 L.Ed.2d at 498.
“The touchstone of our analysis under the Fourth Amendment is always ‘the reasonableness in all circumstances of the particular governmental invasion of a citizen’s personal security.’ ” Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 335 (1977) (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904 (1968)). We must weigh the “balance between the public interest and the individual’s right to *311 personal security free from arbitrary interference by law officers.” Id. at 109, 98 S.Ct. at 332, 54 L.Ed.2d at 336 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607, 614-15 (1975)); see also State v. DeWitt, 811 N.W.2d 460, 468 (Iowa 2012) (“[T]he test for reasonableness of police conduct ‘requires a careful balancing of “the nature and quality of the intrusion on the individual’s Fourth Amendment interests” against the countervailing governmental interests at stake.’ ” (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443, 455 (1989))).
Checking a driver’s license is within a traffic stop’s original mission and is minimally intrusive. The balancing of interests easily favors the State, given the importance of ensuring that drivers who are lawfully stopped are in fact authorized to drive on Iowa roads. These “negligibly burdensome precautions” an officer takes to “complete his mission safely” are reasonable under the Fourth Amendment. Rodriguez, 575 U.S. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500.1 reach the same conclusion under the Iowa Constitution.
States have a “vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles.” Delaware v. Prouse, 440 U.S. 648, 658, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660, 670 (1979). Licenses are issued “to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle.” Id. “[D]rivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves.” Id. at 659, 99 S.Ct. at 1399, 59 L.Ed.2d at 671; see also State v. Mitchell, 498 N.W.2d 691, 694 (Iowa 1993) (“The State has a valid interest in the safety of its citizens on its roads and highways.”). Coleman, a habitual offender, was driving while barred at the time he was pulled over by Officer Morris.
Motorists whose careless or reckless driving is so serious as to lead to license suspension constitute a genuine threat to the safety of their fellow citizens, few of whom will appreciate that today’s decision places them at greater risk of injury.
Holly v. State, 918 N.E.2d 323, 327 (Ind. 2009) (Shepard, C.J., dissenting). I share the concern that today’s decision will put the driving public at greater risk.
If a motorist with a suspended license— who is detained but allowed to drive away without being identified—later harms someone, it “will be difficult ‘to explain to the family’ of an innocent injured party that the police had a chance to prevent the injury but were powerless to act.” Id. (quoting Virginia v. Harris, 558 U.S. 978, 978, 130 S.Ct. 10, 12, 175 L.Ed.2d 322, 324 (2009) (Roberts, C.J., dissenting from denial of certiorari)). Coleman exemplifies the reason officers should be able to check whether a driver they lawfully stop is barred from our roadways. He was pulled over by Officer Morris two days after he was arrested for a second-offense-drunk-driving charge, following at least six prior convictions for driving while barred or suspended and multiple convictions for possession of narcotics.
Iowa Code section 321.174 obligates drivers to possess a valid license and have it in their possession at all times when driving. Id. § 321.174(3). Drivers are required to display the license upon demand by a peace officer. Id. “The statutory authority for police to demand a driver’s license would mean little if the police could not check the validity of the license.” State v. Ellenbecker, 464 N.W.2d 427, 430 (Wis. Ct. App. 1990).
*312 The reason for allowing police, to request a driver’s license on demand is to deter persons from driving without a valid license, since a license is a statement that the driver can be expected to comply with the state’s requirements for safe driving. Where it is reasonable for a police officer to ask for a license, running a status check on the license is simply carrying out this deterrent function of the law.
Id.; see also Godwin, 826 P.2d at 4S5 (same); People v. Redinger, 906 P.2d 81, 88 (Colo. 1995) (en banc) (Vollack, C.J., dissenting) (“Because motorists are required by state law to carry a driver’s license, registration, and proof of insurance when operating a motor vehicle, Officer Wise’s request for such documents was proper.”).
Officers may request proof of liability insurance during a lawful traffic stop, even without an accident. See State v. Acevedo, 705 N.W.2d 1, 2 (Iowa 2005) (stating defendant was stopped for traffic offense and arrested when operating without , a license and without proof of insurance). Iowa has a valid interest in enforcing laws requiring liability insurance to protect accident victims. Allowing officers to request proof of insurance deters uninsured drivers. In the same vein, checking identification during a lawful stop deters barred motorists who may wreak havoc on our roadways. The majority undermines these legislative goals.
Asking a driver for a license also promotes “transparency in traffic stops.” Cummings I, 6 N.E.3d at 739 (Garmin, C. J., dissenting) (citing 625 Ill. Comp. Stat. Ann. 5/11-212 (West 2012) (requiring law enforcement officers to gather statistical information on drivers stopped or cited and department of transportation to analyze data and assess practices that resemble racial profiling)). As the Wisconsin Court of Appeals noted,
In many cases, police officers are required to make a written report of contacts with citizens. An officer needs to know whom he or she is assisting in the event a citizen later complains about improper behavior on the part of the officer or makes any kind of legal claim against the officer.
Ellenbecker, 464 N.W.2d at 430. “Requesting identification may also be beneficial if the seemingly innocuous activity the officer observes later turns out to be illegal— for instance, if the vehicle turns out to have been stolen.” State v. Huck, No. 2014AP2120-CR, 2015 WL 423239, at *4 (Wis. Ct. App. Feb. 3, 2015); see also State v. Calzadas, No. 2015AP162-CR, 2015 WL 5146526, at *2 (Wis. Ct. App. Sept. 3, 2015). Officer Morris knew by his gender that Coleman was not the registered owner of the car.[12] What if minutes after the officer had allowed the driver to depart unidentified, the real owner reported the car stolen?
The safety of the officer is another reason to permit checks of the driver’s identity. This safety interest “stems from the mission of the stop itself.” Rodriguez, 575 U.S. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500. “Traffic stops are ‘especially fraught with danger to police officers.’ ” Id. (quoting Arizona v. Johnson, 555 U.S. 323, 330, 129 S.Ct. 781, 786, 172 L.Ed.2d 694, 702 (2009)). The Cummings II court recognized that Rodriguez relies in part on United States v. Holt, which “approved criminal record and warrant checks ‘even though the purpose of the *313 stop had nothing to do with such prior criminal history.’ ” Cummings II, 46 N.E.3d at 262 (quoting United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001), abrogated on other grounds by United States v. Stewart, 473 F.3d 1266, 1269 (10th Cir. 2007)). These checks were justified because “an officer will be better apprised of whether the detained motorist might engage in violent activity during the stop.” Id. (alteration in original) (quoting Holt, 264 F.3d at 1222). License checks were relevant to officer safety regardless of the original purpose of the stop:
To the extent the ordinary inquiries are justified by the officer safety interest, defendant’s view would also- require a conclusion that it is the type of stop, and not the occurrence of the stop itself, that generates danger for officers. The relevant authorities instead reveal it is the stop itself that poses danger.
Id. (citing Rodriguez, 575 U.S. at -, 135 S.Ct. at 1616, 191 L.Ed.2d at 500).
Traffic stops are inherently dangerous because they involve close officer contact with unsecured individuals.[13] See Long, 463 U.S. at 1052, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221-22; see also State v. Smith, 739 N.W.2d 289, 291 (Iowa 2007) (noting defendant stopped for speeding fired four shots at officer who was unaware vehicle stolen). The Supreme Court has. repeatedly acknowledged the weighty government interest in officer safety during traffic stops.[14] “Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder,” Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 186, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292, 303 (2004). Officers initiating these stops “need to know who[ ] they are dealing with in order to assess the situation [and] the threat to their own safety.” Id.
We should balance this weighty government interest against the minimal intrusion on the defendant’s liberty interest. “[W]hen stopped for a traffic violation, a motorist expects ‘to spend a short period *314 of time answering questions and waiting while the officer checks his license and registration.’ ” Holt, 264 F.3d at 1220 (quoting Berkemer v. McCarty, 468 U.S. 420, 437, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317, 333 (1984)); see also Hiibel, 542 U.S. at 186, 124 S.Ct. at 2458, 159 L.Ed.2d at 302 (“Our decisions make clear that questions concerning a suspect’s identity are a routine and accepted part of many Terry stops.”). Most lowans will be quite surprised to hear Officer Morris violated Coleman’s constitutional rights by asking to see his driver’s license after lawfully stopping the car he was driving.
In Mimms, the Supreme Court held that an officer can require a driver to step out of a vehicle during a traffic stop based on officer safety concerns. 434 U.S. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337. The Court determined the intrusion requiring the driver to get out of the car was “de minimis.” Id. “The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver’s seat of his car or standing alongside it.” Id. In Wilson, the Court expanded this analysis to allow officers to order passengers out of the vehicle. 519 U.S. at 413-14, 117 S.Ct. at 886, 137 L.Ed.2d at 47. The Court reasoned,
On the personal liberty side of the balance, the case for the passengers is in once sense stronger than that for the driver. There is probable cause to believe the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car.
Id. Indeed,
many people would find providing their identification to a police officer for a computer records check far less intrusive than being ordered out of the car to stand on the shoulder of a busy highway or on the side of a street in their neighborhood.
Allen, 779 S.E.2d at 256; see also United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) (“If an officer may ‘as a matter of course’ and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification.” (Citation omitted)); cf. Smith, 683 N.W.2d at 547-48 (holding officer did not “seize” passenger by requesting identification).
The Supreme Court has stressed the need to evaluate the initial detention and scope of the stop to ensure traffic stops are not used as “fishing expedition[s].” Ohio v. Robinette, 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d 347, 356 (1996). “But the Supreme Court has expressly rejected placing any rigid time limitations on Terry stops; instead, the issue is ‘whether the police diligently pursued a means for investigation that was likely to confirm or dispel their suspicions quickly...'” Kothe, 152 S.W.3d at 64 (quoting United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 616 (1985)). A traffic stop’s mission includes both “an investigation into the specific suspected criminal activity and a routine check of the driver’s license,” but “neither the Fourth Amendment nor the Supreme Court dictate that an officer ,.. must investigate the situation in a particular order.” Id. at 65.
Here, there is no evidence—or even suggestion—that Officer Morris failed to diligently pursue the mission of the traffic stop. Neither Coleman nor the majority *315 contend this traffic stop was unduly prolonged by the request to see a driver’s license, which likely transpired in less than a minute.
For these reasons, I do not join the majority’s conclusion that Officer Morris violated Coleman’s rights under the Iowa Constitution.
Mansfield and Zager, JJ., join this dissent.

. See State v. Gaskins, 866 N.W.2d 1, 41 (Iowa 2015) (Waterman, J., dissenting) (criticizing majority opinion that diverged from settled federal precedent and "revers[ed] the district court for failing to credit an argument the defendant never made at trial”); State v. Short, 851 N.W.2d 474, 508 (Iowa 2014) (Waterman, J., dissenting) ("Today’s majority ... once again uses the Iowa Constitution to evade well-settled Fourth Amendment precedent without setting forth any principled basis for construing Iowa’s nearly identically worded search and seizure provision to require greater restrictions on the law enforcement community and elected branches.”); State v. Baldon, 829 N.W.2d 785, 837 (Iowa 2013) (Mansfield, J., dissenting) (noting majority had ”venture[d] into state constitutional issues that no one has briefed”); State v. Pals, 805 N.W.2d 767, 784 (Iowa 2011) (Waterman, J., dissenting) ("Although Pals[’s] appellate brief raised both the federal and Iowa constitutional search and seizure provisions, he never argued our state constitution provided broader protection.”).

. Coleman’s motion to suppress stated in its entirety;
COMES NOW the Defendant by counsel and, pursuant to I.R.Cr.P. 2.11(2)(c) 2.12(l)(a), moves the Court for an order suppressing certain evidence seized as a result of a traffic stop, on or about August 18, 2014, on the ground that the stop was [sic] probable case: the registered owner of the vehicle was not under suspension.
The transcript of the oral hearing on the motion to suppress indicates the district court agreed with the State that our decision in Jackson controlled. Coleman obtained different counsel for his appeal.

.The State in its appellate briefing indicated it "does not contest error preservation,” presumably because it assumed we would honor our precedent to apply the federal standard when the defendant sought no different standard under the Iowa Constitution. See, e.g., State v. Tyler, 830 N.W.2d 288, 291-92 (Iowa 2013). "Where a party raises both state and federal constitutional claims but does not argue that a standard independent of the federal approach should be employed under the state constitution, we ordinarily apply the substantive federal standards....” Id. ”[W]e generally decline to consider an independent state *304 constitutional standard based upon mere citation to the applicable state constitutional provision,” State v. Lowe, 812 N.W.2d 554, 566 (Iowa 2012) (quoting State v. Effler, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., concurring specially)). The State concluded, "Coleman cites both the state and federal constitutions, but does not argue -that one requires a different analysis or result than the other. As such, the Court should treat the claims coextensively.” I agree, but going forward the State should no longer rely on our precedent treating state and federal constitutional claims coextensively.

. For example, in State v. Ochoa, we concluded the state waived several grounds for upholding a warrantless search of a parolee’s motel room based on consent because it failed to raise those grounds in district court. 792 N.W.2d 260, 291-92 (Iowa 2010).

. The majority first cites Rodriguez on page 16 after ten pages discussing earlier Fourth Amendment decisions. The majority first cites Jackson on page 23, after five additional pages discussing pre-Rodriguez cases from other states. In my view, a proper analysis should begin with the controlling precedent.

. Two members of our court dissented, concluding the drug-dog search was lawful based on reasonable suspicion raised during the stop. Pardee, 872 N.W.2d at 397-98 (Cady, C.J., dissenting).

. In Vance, in dicta, we suggested (without citing Jackson or Lloyd) that the issue of whether an officer could request a driver’s license from a detained motorist was debatable. See 790 N.W.2d at 783 n.1 ("Vance’s counsel failed to raise in the district court or on appeal whether the stop continued to be valid upon the stopping officer’s discovery that the driver of the vehicle was, in fact, not the registered owner.... Accordingly, we express no opinion on the merits of this issue because it has not been preserved for our appellate review.”). Vance did not decide the issue and did not have the guidance of Rodriguez, which was decided five years later.

. See, e.g., United States v. Elmore, 304 F.3d 557, 561 n.1 (6th Cir. 2002) (concluding no Fourth Amendment violation resulted when officer approached driver to request license *309 and registration after pulling over for no license plate and then seeing temporary tag in window); State v. Godwin, 826 P.2d 452, 456 (Idaho 1992) (‘‘[A] police officer’s brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the fourth amendment.”); State v. Hill, 606 A.2d 793, 795 (Me. 1992) (determining after valid stop for mistaken traffic violation, asldng for license was minimal intrusion and did not violate Fourth Amendment); Hart v. State, 235 S.W.3d 858, 862 (Tex. Ct. App, 2007) (‘‘[W]here the initial traffic stop is valid, a license check of the driver, even if conducted after the officer has determined the motorist is not guilty of the violation for which he or she was originally stopped, is not unreasonable so long as it does not unduly prolong the motorist’s detention.”); State v. Williams, 655 N.W.2d 462, 469 & n.4 (Wis. Ct. App. 2002) (concluding that officer could have lawfully checked license after pulling over driver who was not registered owner with a suspended license).

. Several courts have continued to refer to the majority rule without addressing the impact of Rodriguez. See, e.g., United States v. Fuller, 120 F.Supp.3d 669, 681-82, 685 (E.D. Mich. 2015) (citing Rodriguez without analysis); State v. Hollister, No. 112, 983, 2016 WL 197742, at *8 (Kan. Ct. App. Jan, 15, 2016) (per curiam) (no citation to Rodriguez).

. In some cases, the officer may be unable to determine the driver is not the registered owner until he or she checks the driver’s license. Some people appear older or younger than their age; even race or gender may not be immediately apparent in a darkened vehicle.

. Statistics from the Federal Bureau of Investigation indicate that a traffic stop poses the second-greatest risk of death for. an officer, after investigation of a suspicious person, and the third-greatest risk of assault. More officers have been killed during traffic violation stops than in attempting an arrest for burglary, robbery, or drugs, or in responding to domestic abuse violence calls. U.S. Dep’t of Justice, FBI, Law Enforcement Officers Felo-niously Killed & Assaulted Table, https://UCR. fbi.gov/leoka/2014/home (follow "Overview” of officers feloniously killed hyperlink; then follow “Table 21” hyperlink); Id. Table 79 (follow "Overview” of officers assaulted hyperlink; then follow "Table 79” hyperlink). In 2005-2014, ninety-three officers were killed during traffic stops. Id. Table 21.

. See Johnson, 555 U.S. at 330-32, 129 S.Ct. at 786-87, 172 L.Ed.2d at 702-03 (holding officer authorized to perform pat-down on passenger because of safety interest of officer); Maryland v. Wilson, 519 U.S. 408, 413, 117 S.Ct. 882, 885, 137 L.Ed.2d 41, 47 (1997) (recognizing "traffic stops may be dangerous encounters” and citing statistics of officers killed during traffic stops in 1994); Long, 463 U.S. at 1052, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221-22 ("[W]e stress that a Terry investigation, such as the one that occurred here, involves a police investigation 'at close range' when the.officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a ‘quick decision as to how to protect himself and others from possible danger.... ’ ” (quoting Terry, 392 U.S. at 24, 28, 88 S.Ct. at 1881, 1883, 20 L.Ed.2d at 908, 910)); Mimms, 434 U.S. at 110, 98 S.Ct. at 333, 54 L.Ed.2d at 336 (stating government’s interest in safety is “both legitimate and weighty” and "specifically recognizpng] the inordinate risk confronting an officer as he approaches a person seated in an automobile”); Terry, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 906 ("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.”).